IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

<table>
<tr><td>

ROOSEVELT MORRIS,

    Petitioner,

vs.

TONY PARKER,

    Respondent.

</td><td>

Х<br>
Х<br>
Х<br>
Х<br>
Х<br>
Х<br>
Х<br>
Х<br>
Х<br>
Х<br>
Х

</td><td>

No. 11-2331-STA-cgc

</td></tr>
</table>

ORDER OF DISMISSAL
ORDER DENYING CERTIFICATE OF APPEALABILITY
ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH
AND
ORDER DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

On April 28, 2011, Petitioner Roosevelt Morris, Tennessee Department of Correction ("TDOC") prisoner number 373310, an inmate at the Northwest Correctional Complex ("NWCX") in Tiptonville, Tennessee, filed a *pro se* petition pursuant to 28 U.S.C. § 2254. (Petition ("Pet."), ECF No. 1.) On June 29, 2011, Petitioner Morris filed an amended petition. (Amended ("Am.") Pet, ECF No. 3.) On November 11, 2011, the Court directed the Respondent to file the state-court record and a response to the amended petition. (Order, ECF No. 4.) On February 13, 2012, Respondent filed an answer. (Answer, ECF No. 10.) On February 15, 2012, Respondent filed the state-court record. (Record ("R."), ECF Nos. 11, 12, & 13.) On April 24, 2012, Petitioner Morris filed a reply. (Reply, ECF No. 16.)

I.  <u>STATE COURT PROCEDURAL HISTORY</u>

On August 8, 2002, a grand jury sitting in Shelby County, Tennessee, indicted Roosevelt Morris on two counts of attempted first degree murder. (Indictments, Transcript ("Tr.") of Record ("R."), ECF No. 11-1 at Page ID # 129-31.) On January 24, 2004, following a jury trial in the Criminal Court for Shelby County, Tennessee, Petitioner was convicted of both counts as charged. (Tr. of R., ECF No. 11-1 at Page ID # 137.) The trial court sentenced Morris to an effective sentence of fifty (50) years in prison. (Judgments ("J."), Tr. of R., ECF No. 11-1 at Page ID 149-50.) The Tennessee Court of Criminal Appeals affirmed Petitioner's convictions, but modified his sentence to an effective forty-seven (47) years in prison. *State v. Morris*, No. W2004-02277-CCA-MR3-CD, 2005 WL 6235723 (Tenn. Crim. App. Sept. 7, 2005).

On October 25, 2005, Petitioner Morris filed a *pro se* petition pursuant to the Tennessee Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101 to -122, in the Criminal Court for Shelby County. (Pet. for Relief from Conviction or Sentence, Tr. of R., ECF No. 12-4 at Page ID # 1111-19.) On September 1, 2006, counsel filed an amended petition. (Am. Pet. for Relief from Conviction or Sentence, Tr. of R., ECF No. 12-4 at Page ID # 1120-53.) On February 5, 2008, counsel filed a petition seeking retroactive application of *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). (Pet., Tr. of R., ECF No. 12-4 at

Page ID # 1276-80.)  An evidentiary hearing was held, and on May

27, 2008, the post-conviction trial court issued an order denying

relief.  (Order, Tr. of R., ECF No. 12-4 at Page ID # 1288-1306.)

The Tennessee Court of Criminal Appeals affirmed.  *Morris v. State*,

No. W2008-01449-CCA-R3-PC, 2010 WL 3970371 (Tenn. Crim. App. Oct.

11, 2010), *perm. app. denied* (Tenn. Jan. 13, 2011).

The facts underlying Petitioner's conviction are set forth in

the opinion of the Tennessee Court of Criminal Appeals on direct

appeal:

> Teresa Washington testified that she met and began
> dating Roosevelt Morris in December 2000.  In
> approximately September 2001, the two began living
> together in a residence on Glankler.  In approximately
> November 2001, Morris moved out of the residence, taking
> his furniture with him.  Ms. Washington stated that she
> "just no longer want[ed] to be with him.  He was
> controlling." Ms. Washington testified that after Morris
> left, he started calling her and going by her residence
> and her work-place.  She did not want or invite or
> encourage these calls or visits.
>
> Ms. Washington stated that Morris threatened her,
> "say[ing] things like he wasn't going to leave [her]
> alone.  And that if he couldn't have [her], no one else
> could have [her.]"  When Ms. Washington met James Davis
> in January 2002 and began dating him, she sought and
> obtained an order of protection against Morris.  The
> order was entered by the general sessions court of Shelby
> County, Tennessee, on February 12, 2002.  A copy of the
> order was admitted into evidence and provides, in
> pertinent part, that Roosevelt Morris "is refrained from
> coming about [Ms. Washington] for any purpose and
> specifically from abusing, threatening to abuse [her], or
> committing any acts of violence upon [her]."  The order
> also prohibited Morris from telephoning Ms. Washington,
> stalking her, and committing acts of violence against her
> property.  According to Ms. Washington, Morris was not
> deterred by the order, but continued to call her and come
> over to her home.  She stated that, at one point, he

"pulled up all [her] landscaping and put black tar over [her] motion detector lights so that they wouldn't go off and unscrewed [her] light bulbs."

Ms. Washington testified that Morris called her on the morning of May 17, 2002, and told her he "had something for [her]." She replied that he did not have anything for her and hung up. That night, she arrived home at about 12:30 a.m. Mr. Davis was already at her home. She parked her car behind his in the single lane driveway. She went to bed with Mr. Davis but heard noises that sounded like someone was outside. She told Mr. Davis but he replied that it was just the wind. She tried to look out of her windows with a flashlight but did not see anything.

She and Mr. Davis woke up at about four o'clock that morning. Mr. Davis had to leave to go to work. Ms. Washington went out of the house so that she could move her car in order that Mr. Davis could leave in his car. She opened the front door and began to open the glass storm door. Mr. Davis was standing behind her. Ms. Washington described what happened next:

> I opened my door and I seen someone standing over to my right and I screamed. And I seen this flashing, a boom go off. And it went off again. I just saw a flash. So I fell out on my floor and I played dead.

Ms. Washington said that, with the second "boom," which was just seconds after the first one, she felt a bullet go past her left temple. As she was laying in the doorway curled in a fetal position "playing dead," she felt the person step over her into the house. She then heard more gunshots and the sound of one or more persons falling to the floor. Ms. Washington next heard Mr. Davis pleading for his life and telling the intruder to let the gun go. At that point, she testified, she heard Morris' voice. Morris said that they had ruined his life and that he was going to kill them.

When Ms. Washington realized who the intruder was, she jumped up and ran to see if she could assist Mr. Davis in wresting the gun from Morris. The two men were on the floor struggling, with Mr. Davis on top of Morris. Ms. Washington jumped on Mr. Davis' back and reached down, trying to get the gun away from Morris. She then

noticed that Morris was wearing gloves. At that point, she testified, she "just panicked and . . . just went after [Morris'] eyeballs." Ms. Washington tried to gouge out Morris' eyes with her fingers.

Ms. Washington did not realize that Mr. Davis had been shot. As she was on his back trying to injure the Morris, Mr. Davis told her that he had been shot and that she was "smushing" him such that he couldn't breathe. Ms. Washington got off of Mr. Davis and ran to a neighbor's house to call the police. When the neighbor answered the door, she explained what was happening. The neighbor called the police and would not let Ms. Washington leave until the police arrived.

James Davis testified that he is six feet, two inches tall and weighs 280 pounds. He stated that he knew of Morris prior to the shooting, but had not met him. They had spoken over the telephone three or four times when Morris was seeking to speak to Ms. Washington. Mr. Davis stated that his conversations with Morris during these calls were not hostile.

Mr. Davis testified that, on the night in question, he arrived at Ms. Washington's house at around midnight; Ms. Washington was already there. They went to bed and woke up at about four o'clock a.m.; he was running late for work and was in a hurry. When he went to leave, Ms. Washington was in front of him at the front door. Mr. Davis testified:

> Ms. Washington opened the inner door and she unlocked the outer door and all of a sudden a body appear. I hear a shot, boom, she screams, she falls. And, well, after that this gentleman entered the house, he shoots me and he's just goes shooting three or four more times.

Mr. Davis testified that the "gentleman" was wearing a cap, a black jacket and black jeans. He was also wearing black gloves.

Mr. Davis stated that he thought he recognized the intruder as a man that he had seen walking in front of the house a number of times. Mr. Davis explained that the intruder was the same height and had the same "high cheekbones" as the man he had seen previously.

Mr. Davis explained that the intruder shot him as he stepped over Ms. Washington and entered the house. Mr. Davis was shot in the right chest. The intruder shot several more times as he came into the house. The shots then paused and Mr. Davis noticed that the intruder was "messing with" the gun because it had "jammed." At that point, Mr. Davis threw his hands around the intruder's neck and "throwed him on [the] floor." The intruder hit his head on the coffee table as the two men fell to the floor. The two men began struggling over the gun. The intruder said, "Y'all don't know what love is. Y'all done ruined my life."

The men continued to struggle over the gun. Ms. Washington got up and jumped on Mr. Davis' back. She tried to gouge out the intruder's eyes and was jumping up and down on Mr. Davis while doing so. Mr. Davis told her to "get up" because he had been shot. Ms. Washington then ran out of the house.

Mr. Davis kept trying to get the gun away from the intruder but he would not let it go. After Ms. Washington left, he finally let go of it. Mr. Davis stated that the intruder then got up and ran away. Mr. Davis was not able to chase after him, but made it out onto the front porch. He hollered for help but kept getting weak. He laid down on the porch and the next thing he knew, the police were there. They discovered a handgun under Mr. Davis and took control of it. The paramedics then arrived and took Mr. Davis to the hospital.

Mr. Davis identified Morris at trial as the intruder who shot him. Mr. Davis also identified a cap recovered at the scene as the one worn by Morris during the attack.

Officer James Gaylor received a "shots fired" call and responded to the scene at about 4:45 in the morning on May 18, 2002. He saw a man lying on the porch who appeared to be hurt or wounded. Officer Gaylor approached and noticed a handgun laying under the man; the man did not have the gun in his hand. Officer Gaylor recovered the gun and handed it to Officer Paul Bishop, who had also arrived on the scene.

Officer Paul Bishop testified that he checked the gun and found one live round in the chamber, none in the magazine. Officer Bishop described the gun as a .380

semiautomatic. Officer Bishop identified the gun at trial and it was admitted into evidence. He stated that he determined during his investigation that the gun had not been reported stolen, but he did not know who owned the gun.

Officer Bishop explained that Ms. Washington was across the street when he arrived, "frantically screaming." She came over to them as they were attending to Mr. Davis. Officer Bishop stated that it took about an hour for Ms. Washington to tell him what had happened. By this time, Mr. Davis had been transported to the hospital. Officer Bishop testified as to what Ms. Washington told him as follows:

> She stated that her boyfriend, Mr. Davis, had to go to work. That she had to move her car, it was a single car driveway with the two cars parked in the drive. She said that she opened the door, she saw something off to the side and then heard two shots. The door that she had opened was a wrought iron door that had glass panels in it. The glass panel shattered. She fell backwards into the house.
>
> She then stated that, that she was laying on the ground when her ex-boyfriend rushed into the house, more shots were fired. Mr. Davis was struck. That the two were wrestling on the ground. And she told me that she tried to gouge his eyes out.

Officer Bishop also stated that Ms. Washington told him the attacker's name was Roosevelt Morris. She also told him that Mr. Morris had threatened her over the phone the day before, telling her he had "something for [her]." Ms. Washington told Officer Bishop about the order of protection.

Officer Bishop went to the hospital later that morning and spoke with Mr. Davis. He asked Mr. Davis about what had happened and Mr. Davis told him "that he was leaving his girlfriend's house when her ex-boyfriend entered the house. That they fought over a gun and he got shot." Mr. Davis told Officer Bishop that the ex-boyfriend had brought the gun into the house.

The police put out a bulletin on Morris advising that he might have eye injuries. A call came in from the same hospital in which Mr. Davis was located that a man

had come in with eye injuries. Officer Bishop responded and found Morris in a trauma room. Morris' eyes were bleeding. Officer Bishop asked Morris his name, and he responded, "Roosevelt Morris." Officer Bishop placed Morris under arrest. Officer Bishop had no further conversation with Morris.

Sergeant Michelle Oliver testified that she was one of the crime scene officers investigating this case. At the scene, she found broken glass on the front porch and what appeared to be blood. She described the items inside the front room of the house as "disheveled." She and Officer Alvin Peppers collected two empty shell casings from inside the house and she saw two holes in one of the walls that appeared to have been made by bullets. They found no shell casings in the yard. She did not test for any fingerprints at the scene.

Officer Alvin Peppers, who assisted Sgt. Oliver as a crime scene officer, testified that there appeared to have been a struggle inside the residence. He described the two shell casings collected as .380 caliber.

Morris testified on his own behalf. He acknowledged his past romantic relationship with Ms. Washington and agreed that they had lived together on Glankler for several months. He offered a different explanation of why they broke up, however. Morris testified that Ms. Washington had "at times . . . a very nasty attitude, and [was] very controlling and very demanding." Morris also found Ms. Washington's mother "absolutely intolerable." The final straw, however, was some nude photographs that Ms. Washington kept of her ex-boyfriends. Ms. Washington refused to destroy the photographs in spite of Morris' request. When he discovered that she had kept the photographs, he "just couldn't . . . take no more." At that point, he moved out and they broke up.

Morris testified that Ms. Washington was pregnant at the time they broke up. He stated that, after he left, she filled up his answering service with messages: "all of them were pleading [him] to come back home. Why did [he] leave? . . . Oh, what about the baby?" When he returned the calls a few days later, she was "absolutely furious." She told him she was going to have an abortion.

Morris next spoke with Ms. Washington by telephone in January. He described this conversation as "very amiable." He stated that she told him that she had had the abortion, and wanted to know if he was interested in knowing if it was a boy or a girl. He thought he remembered her telling him it was a boy. Later that month, he testified, they got together and ate, went shopping, and then to a hotel. Morris stated that he and Ms. Washington had consensual sexual contacts three or four times between January 2002 and May 18, 2002. Morris also stated that he was aware of the order of protection during this time.

Morris testified that Ms. Washington left a message on his service on May 17, 2002. When he returned the call, she told him she wanted to get together. He asked her for a good time to come by, and she told him it would have to be after three a.m. so that Mr. Davis would be gone. She told him to knock "lightly" on the door and that if she did not answer, to leave. Morris followed these instructions. Ms. Washington opened the door and as he began to walk into the house, he noticed a "strange look" on Ms. Washington's face. Morris stated that it "wasn't a pleasant look." As he went through the door, he stated, he saw Ms. Washington looking beyond him and he felt a "presence" behind him. He turned around and saw Mr. Davis behind him with a gun.

According to Morris, he and Mr. Davis began struggling with the gun at that point. Morris described himself as five feet, six inches tall, 180 pounds, and said he knew what he had to do was to hold onto the hand in which Mr. Davis held the gun. Morris stated, "I would not let it go." During the struggle, Ms. Washington struck Morris on the back of his head with an object.

Morris stated that the gun went off several times during the struggle. Morris stated that the gun went off while they were in the house and that the struggle continued outside onto the porch where the gun discharged again. During the struggle, somebody started gouging him in his eyes. At some point he heard Mr. Davis say something about being hurt or hit or something and while Mr. Davis seemed distracted by his condition, Morris fled. He stated that he ran around to the next street and returned to the hotel room that he had rented for his "rendezvous" with Ms. Washington. From there he managed to drive to his brother's house where he was living, in

spite of his "substantial[ly] injured" eyes. From there, he stated, his brother called 911. An ambulance arrived and took him to the hospital.

According to Morris, he had suffered from a "fractured skull" and "air on the brain." Additionally, "the protective skin over the outer eye was severely lacerated" and his corneas and retinas were "severely damaged." He was told, he said, that his fractured skull could not be treated and he was given "something, they said it would, they would dissolve that air bubble."

*State v. Morris*, 2005 WL 6235723 at *1-*6.

## II. PETITIONER'S FEDERAL HABEAS CLAIMS

In this § 2254 petition, Morris contends that:

1.   trial counsel provided ineffective assistance by:

    (a)   failing to object to the State's questions about Petitioner's post-arrest silence during trial (Am. Pet., ECF No. 3 at Page ID # 29);

    (b)   failing to object to the State's comments about Petitioner's post-arrest silence during closing argument (Am. Pet., *id.*);

    (c)   failing to object to other instances of prosecutorial misconduct during closing argument (Am. Pet., ECF No. 3 at Page ID # 30);

    (d)   failing to move for dismissal of charges, or in the alternative, failing to request a jury instruction as to lost or destroyed evidence (Am. Pet., *id.*);

    (e)   failing to adequately investigate the case by investigating ownership of the handgun (Am. Pet., ECF No. 3 at Page ID # 31);

    (f)   failing to adequately investigate the case by having the pistol, casing, clip, and unfired bullet tested for fingerprints (Am. Pet., *id.*);

(g) failing to adequately investigate the case by interviewing Teresa Washington's neighbors (Am. Pet., *id.*);

(h) failing to adequately investigate the case by procuring James Davis' medical records (Am. Pet., *id.*);

(i) failing to adequately investigate the case by investigating Teresa Washington's background (Am. Pet., *id.*);

(j) failing to object or raise in a motion for new trial the trial court's charge to the jury on identity (Am. Pet., *id.*);

(k) failing to deliver an effective closing argument (Am. Pet., *id.*);

(l) opening the door to cross-examination about Petitioner's post-arrest silence;

(m) failing to ask for recusal of the trial judge after comments the judge made at a bond hearing (Am. Pet., ECF No. 3 at Page ID # 31-32);[1] and

2. the sentences imposed violate Petitioner's Sixth Amendment right to trial by jury under *Blakely v. Washington* (Am. Pet., *id.*).

Morris raised the foregoing issues of ineffective assistance in the post-conviction petition (Am. Pet. for Relief from Conviction or Sentence, Tr. of R., ECF No. 12-4 at Page ID # 1122-50), but failed to present issue 1(d), issue 1(e), issue 1(g),

---

[1] The amended petition also contends that the cumulative effect of counsel's errors constitutes ineffective assistance. (Am. Pet., ECF No. 3 at Page ID # 32.) The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief. *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002) ("The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief."), *amended on other grounds*, 377 F.3d 459 (6th Cir. 2002); *see also Gillard v. Mitchell*, 445 F.3d 883, 898 (6th Cir. 2006) (same); *Moore v. Parker*, 425 F. 3d 250, 256 (6th Cir. 2005) (same). This issue is without merit and is DENIED without further discussion.

issue 1(h), issue 1(i), issue 1(j), issue 1(k), issue 1(l), and issue 1(m) to the Tennessee Court of Criminal Appeals in the post-conviction appellate proceedings.  (Appellant's Br., ECF No. 13-8 at Page ID # 2283.)  Morris presented issue 2 to the Tennessee Court of Criminal Appeals on direct appeal.  (Appellant's Br., ECF No. 12-1 at Page ID # 1054-55.)

III. <u>LEGAL STANDARDS</u>

The statutory authority for federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

A.    <u>Exhaustion and Procedural Default</u>

Twenty-eight U.S.C. §§ 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has exhausted available state remedies by presenting the same claim sought to be redressed in a federal habeas court to the state courts.  *Cullen v. Pinholster*, ___ U.S. ___, ___, 131 S. Ct. 1388, 1398, 79 L. Ed. 2d 557 (2011).  The petitioner must "fairly

present"[2] each claim to all levels of state court review, up to and including the state's highest court on discretionary review, *Baldwin v. Reese*, 541 U.S. 27, 29, 124 S. Ct. 1347, 1349, 158 L. Ed. 2d 64 (2004), except where the state has explicitly disavowed state supreme court review as an available state remedy, *O'Sullivan v. Boerckel*, 526 U.S. 837, 847-48, 119 S. Ct. 1728, 1733-34, 144 L. Ed. 2d 1 (1999). Tennessee Supreme Court Rule 39 eliminated the need to seek review in the Tennessee Supreme Court to "be deemed to have exhausted all available state remedies." *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003), *cert. denied*, 541 U.S. 956, 124 S. Ct. 1654, 158 L. Ed. 2d 392 (2004); *see Smith v. Morgan*, 371 F. App'x 575, 579 (6th Cir. 2010) ("*Adams* not only requires the federal courts to ensure that the state courts have the first opportunity to review and evaluate legal claims . . . but also mandates that the federal courts respect the duly-promulgated rule of the Tennessee Supreme Court that recognizes the law and policy-making function of that court and the court's desire not to be entangled in the business of simple error correction").

The procedural default doctrine is ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446, 452-53, 120 S. Ct. 1587, 1592, 146 L. Ed. 2d 518 (2000) (noting the interplay

---

[2] For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made*." Anderson v. Harless*, 459 U.S. 4, 6, 103 S. Ct. 276, 277, 74 L. Ed.2d 3 (1982) (per curiam)(internal citation omitted). Nor is it enough to make a general appeal to a broad constitutional guarantee. *Gray v. Netherland*, 518 U.S. 152, 163, 116 S. Ct. 2074, 2081, 135 L. Ed. 2d 457 (1996).

between the exhaustion rule and the procedural default doctrine).
If the state court decides a claim on an independent and adequate
state ground, such as a procedural rule prohibiting the state court
from reaching the merits of the constitutional claim, a petitioner
ordinarily is barred from seeking federal habeas review.
*Wainwright v. Sykes*, 433 U.S. 72, 81-82, 97 S. Ct. 2497, 2503-04,
52 L. Ed. 2d 594 (1977), *reh'g denied*, 434 U.S. 880, 98 S. Ct. 241,
54 L. Ed. 2d 163 (Oct. 3, 1977); *see Walker v. Martin*, ___ U.S.
___, ___, 131 S. Ct. 1120, 1127, 179 L. Ed. 2d 62 (2011) ("A
federal habeas court will not review a claim rejected by a state
court if the decision of the state court rests on a state law
ground that is independent of the federal question and adequate to
support the judgment"); *Coleman v. Thompson*, 501 U.S. 722, 729-30,
111 S. Ct. 2546, 2554, 115 L. Ed. 2d 640 (1991)(same).[3] If a claim
has never been presented to the state courts, but a state court
remedy is no longer available (*e.g.*, when an applicable statute of
limitations bars a claim), the claim is technically exhausted, but
procedurally barred. *Coleman*, 501 U.S. at 731-32, 111 S. Ct. at
2555; *see also Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004)

---

[3]    The state-law ground may be a substantive rule dispositive of the
case, or a procedural barrier to adjudication of the claim on the merits. *Walker*,
__ U.S. at __, 131 S. Ct. at 1127. A state rule is an "adequate" procedural
ground if it is "firmly established and regularly followed." *Id.* (quoting *Beard
v. Kindler*, 130 S. Ct. 612, 618, 175 L. Ed. 2d 417 (2009)). "A discretionary
state procedural rule . . . can serve as an adequate ground to bar federal habeas
review . . . even if the appropriate exercise of discretion may permit
consideration of a federal claim in some cases but not others." *Id.* at 1128
(quoting *Kindler*, 130 S. Ct. at 618)(internal citations & quotation marks
omitted).

(the procedural default doctrine prevents circumvention of the exhaustion doctrine), *cert. denied*, 544 U.S. 928, 125 S. Ct. 1653, 161 L. Ed.2d 490 (2005).[4]

Under either scenario, a petitioner must show cause to excuse his failure to present the claim fairly and actual prejudice stemming from the constitutional violation or, alternatively, that a failure to review the claim will result in a fundamental miscarriage of justice. *Schlup v. Delo*, 513 U.S. 298, 320-21, 115 S. Ct. 851, 864, 130 L. Ed. 2d 808 (1995); *Coleman*, 501 U.S. at 750, 111 S. Ct. at 2565. The latter showing requires a petitioner to establish that a constitutional error has probably resulted in the conviction of a person who is actually innocent of the crime. *Schlup*, 513 U.S. at 321, 115 S. Ct. at 864; *see also House v. Bell*, 547 U.S. 518, 536-539, 126 S. Ct. 2064, 2076-78, 165 L. Ed. 2d 1 (2006) (restating the ways to overcome procedural default and further explaining the actual innocence exception).

B.   Merits Review

Section 2254(d) establishes the standard for addressing claims that have been adjudicated in state courts on the merits:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

---

[4]     To avoid procedural default, federal law requires a federal habeas petitioner in Tennessee to present his federal claims to the Tennessee Court of Criminal Appeals. *Covington v. Mills*, 110 F. App'x 663, 666 (6th Cir. 2004).

> (1)  resulted in a decision that was contrary to, or
>      involved an unreasonable application of, clearly
>      established Federal law, as determined by the
>      Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an
>      unreasonable determination of the facts in light of
>      the evidence presented in the State court
>      proceeding.

28 U.S.C. § 2254(d)(1)-(2). The petitioner carries the burden of proof for this "difficult to meet" and "highly deferential [AEDPA] standard," which "demands that state-court decisions be given the benefit of the doubt." *Cullen*, ___ U.S. at ___, 131 S. Ct. at 1398 (quoting *Harrington v. Richter*, ___ U.S. ___, ___, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011), and *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S. Ct. 357, 360, 154 L. Ed. 2d 279 (2002) (per curiam), *reh'g denied*, 537 U.S. 1149, 123 S. Ct. 957, 154 L. Ed. 2d 855 (Jan. 13, 2003)).[5]

Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen*, ___ U.S. at ___, 131 S. Ct. at 1399. A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts."

---

[5]  The AEDPA standard creates "a substantially higher threshold" for obtaining relief than a *de novo* review of whether the state court's determination was incorrect. *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S. Ct. 1933, 1940, 167 L. Ed. 2d 836 (2007) (citing *Williams v. Taylor*, 529 U.S. at 410, 120 S. Ct. at 1522).

*Williams v. Taylor*, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000).[6] An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 412-13, 120 S. Ct. at 1523. The state court's application of clearly established federal law must be "objectively unreasonable." Id. at 409, 120 S. Ct. at 1521. The writ may not issue merely because the habeas court, in its independent judgment, determines that the state court decision applied clearly established federal law erroneously or incorrectly. *Renico v. Lett*, 559 U.S. 766, 773, 130 S. Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010) (citing *Williams*, 529 U.S. at 411, 129 S. Ct. at 1522).

There is little case law addressing the standard in § 2254(d)(2) that a decision was based on "an unreasonable determination of facts." However, in *Wood v. Allen*, 558 U.S. 290, 301, 130 S. Ct. 841, 849, 175 L. Ed. 2d 738 (2010), *reh'g denied*, 130 S. Ct. 1942, 176 L. Ed. 2d 405 (Mar. 22, 2010), the Supreme Court stated that a state-court factual determination is not "unreasonable" merely because the federal habeas court would have

---

[6] The "contrary to" standard does not require citation of Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (per curiam), *reh'g denied*, 537 U.S. 1148, 123 S. Ct. 955, 154 L. Ed. 2d 854 (Jan. 13, 2003); *see Mitchell v. Esparza*, 540 U.S. 12, 15-16, 124 S. Ct. 7, 10, 157 L. Ed. 2d 263 (2003) (same), *reh'g denied*, 540 U.S. 12, 16, 124 S. Ct. 1124, 157 L. Ed. 2d 956 (Jan. 12, 2004); *Treesh v. Bagley*, 612 F.3d 424, 429 (6th Cir. 2010) (same), *cert. denied*, ___ U.S. ___, 131 S. Ct. 1678, 179 L. Ed. 2d 622 (Mar. 21, 2011).

reached a different conclusion.[7] In *Rice v. Collins*, 546 U.S. 333, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006), the Court explained that "[r]easonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination." *Rice*, 546 U.S. at 341-42, 126 S. Ct. at 976.

The Sixth Circuit has described the § 2254(d)(2) standard as "demanding but not insatiable" and emphasizes that, pursuant to § 2254(e)(1), the state court factual determination is presumed to be correct absent clear and convincing evidence to the contrary. *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010), *reh'g and reh'g en banc denied* (Dec. 28, 2010). A state court adjudication will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding. *Id.; see also Hudson v. Lafler*, 421 F. App'x 619, 624 (6th Cir. 2011) (same).

There is no AEDPA deference and the standards of § 2254(d) do not apply if a habeas claim is fairly presented in the state courts but not adjudicated on the merits. *Montes v. Trombley*, 599 F.3d

---

[7]     In *Wood*, the Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), "a petitioner must establish only that the state-court factual determination on which the decision was based was "unreasonable," or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence." *Wood*, 558 U.S. at 293, 299, 120 S. Ct. at 845, 848. The Court ultimately found it unnecessary to reach that issue, and left it open "for another day". *Id.* at 300-01, 303, 120 S. Ct. at 849, 851 (citing *Rice v. Collins*, 546 U.S. 333, 339, 126 S. Ct. 969, 974, 163 L. Ed. 2d 824 (2006) in which the Court recognized that it is unsettled whether there are some factual disputes to which § 2254(e)(1) is inapplicable).

490, 494 (6th Cir. 2010), *reh'g and reh'g en banc denied* (Apr. 20, 2010); *see Thompson v. Warden, Belmont Corr. Inst.*, 598 F.3d 281, 285 (6th Cir. 2010) (a claim that is fairly presented in the state court but not addressed is subject to *de novo* review by the habeas court). The pre-AEDPA *de novo* review standard applies for questions of law and mixed questions of law and fact, and the clear error standard applies to factual findings. *Montes*, 599 F.3d at 494.

IV.  ANALYSIS OF PETITIONER'S CLAIMS

  A.  Issues Barred by Procedural Default

  Issues 1(d), 1(e), 1(g), 1(h), 1(i), 1(j), 1(k), 1(l) & 1(m)

Petitioner did not properly exhaust Issues 1(d), 1(e), 1(g), 1(h), 1(i), 1(j), 1(k), 1(l) & 1(m) because he did not present those claims to the Tennessee Court of Criminal Appeals in his post-conviction appeal. *Baldwin*, 541 U.S. at 29, 124 S. Ct. at 1349. The issues have been exhausted through Morris' procedural default, and he has no avenue remaining for presentation of the claims given the state statute of limitations on state post-conviction relief. This procedural default operates as a complete and independent procedural bar to federal habeas review of these issues.

"There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." *Coleman v. Thompson*, 501 U.S. at 752, 111 S. Ct. at 2566 (internal citations omitted). Attorney error cannot constitute

"cause" for a procedural default "because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must bear the risk of attorney error." *Id.* at 753, 111 S. Ct. at 2566-67 (internal quotation marks omitted). Thus, where the State has no constitutional obligation to ensure that a prisoner is represented by competent counsel, the petitioner bears the risk of attorney error. *Id.* at 754, 111 S. Ct. at 2567.[8]

Until recently, a habeas petitioner could not obtain relief on a claim of ineffective assistance of post-conviction counsel. In 2012, the Supreme Court issued its decision in *Martinez v. Ryan*, ___ U.S. ___, ___, 132 S. Ct. 1309, 1320, 182 L. Ed. 2d 272 (2012), which recognized a narrow exception to the rule stated in *Coleman* "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding . . . ." *Martinez*, ___ U.S. at ___, 132 S. Ct. at 1320. In such cases, "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance of counsel if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id.*, 132 L. Ed. 2d at 1320. The Supreme Court also emphasized that "[t]he rule of *Coleman* governs in all but the limited circumstances

---

[8]    *See also* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").

recognized here. . . . It does not extend to attorney errors in other proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons." *Id.* at ___, 132 S. Ct. at 1320. The requirements that must be satisfied to excuse a procedural default under *Martinez* are as follows:

> (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, ___ U.S. ___, ___, 133 S. Ct. 1911, 1918, 185 L. Ed. 2d 1044 (2013).

*Martinez* arose under an Arizona law that does not permit ineffective assistance claims to be raised on direct appeal. *Id.* at ___, 132 S. Ct. at 1313. In its subsequent decision in *Trevino v. Thaler*, ___ U.S. at ___, 133 S. Ct. at 1921, the Supreme Court extended its holding in *Martinez* to states in which a "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal . . . ." Thus, the decision in *Trevino* modified the fourth requirement stated by *Coleman* for

overcoming a procedural default. The Sixth Circuit Court of Appeals has held that the decisions in *Martinez* and *Trevino* are applicable to Tennessee prisoners. *Sutton v. Carpenter*, ___ F. 3d at ___, 2014 WL 1041695, at *1.

*Martinez* and *Trevino* cannot excuse Petitioner's default of these claims. The holding of *Martinez* does not encompass claims that post-conviction appellate counsel was ineffective. *See Martinez*, ___ U.S. at ___, 132 S. Ct. at 1319 ("*Coleman* held that an attorney's negligence in a postconviction proceeding does not establish cause, and this remains true except as to initial review collateral proceedings for claims of ineffective assistance at trial."); *see also Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013) ("Under *Martinez*'s unambiguous holding our previous understanding of *Coleman* in this regard is still the law - ineffective assistance of post-conviction counsel cannot supply cause for procedural default of a claim of ineffective assistance of appellate counsel."). Issues 1(d), 1(e), 1(g), 1(h), 1(i), 1(j), 1(k), 1(l) & 1(m) are barred by Petitioner's procedural default.

B.  Exhausted Issues

Issue 1(a), Issue 1(b), Issue 1(c) & Issue 1(f)

Ineffective Assistance

Morris contends that his trial counsel rendered ineffective assistance, in violation of the Sixth Amendment. A claim that ineffective assistance of counsel has deprived a defendant of his

Sixth Amendment right to counsel is controlled by the standards stated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), *reh'g denied*, 467 U.S. 1267, 104 S. Ct. 3562, 82 L. Ed. 2d 864 (June 25, 1984). The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Id.* at 686, 104 S. Ct. 2064.

To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S. Ct. at 2064. "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance. [*Strickland*, 466 U.S.] at 689, 104 S. Ct. 2052. The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' *Id.*, at 687, 104 S. Ct. 2052." *Harrington*, ___ U.S. at ___, 131 S. Ct. at 787.

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.[9]  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694; 104 S. Ct. at 2068.  "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding.  Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Harrington*, 131 S. Ct. at 787-88 (internal citations & quotation marks omitted) (citing *Strickland*, 466 U.S. at 687, 693, 104 S. Ct. at 2064, 2052); *see also Wong v. Belmontes*, 558 U.S. 15, 27, 130 S. Ct. 383, 390-91, 175 L. Ed. 2d 328 (2009) (per curiam) ("But *Strickland* does not require the State to 'rule out'" a more favorable outcome to prevail.  "Rather, *Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different"), *reh'g denied*, 130 S. Ct. 1122, 175 L. Ed. 2d 931 (Jan. 11, 2010).

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 1485, 176 L. Ed. 2d 284 (2010).

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve.

---

[9]  "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant[.]" *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069.  If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient.  *Id.*

> *Strickland*, 466 U.S., at 689-690, 104 S. Ct. 2052.  Even
> under *de novo* review, the standard for judging counsel's
> representation is a most deferential one.  Unlike a later
> reviewing court, the attorney observed the relevant
> proceedings, knew of materials outside the record, and
> interacted with the client, with opposing counsel, and
> with the judge.  It is "all too tempting" to "second-
> guess counsel's assistance after conviction or adverse
> sentence."  *Id.*, at 689, 104 S. Ct. 2052; *see also Bell
> v. Cone*, 535 U.S. 685, 702, 122 S. Ct. 1843, 152 L. Ed.
> 2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372,
> 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993).  The question
> is whether an attorney's representation amounted to
> incompetence under "prevailing professional norms," not
> whether it deviated from best practices or most common
> custom.  *Strickland*, 466 U.S., at 690, 104 S. Ct. 2052.

*Harrington*, ___ U.S. at ___, 131 S. Ct. at 788.

The deference to be accorded a state-court decision is
magnified when reviewing an ineffective assistance claim under 28
U.S.C. § 2254(d):

> Establishing that a state court's application of
> *Strickland* was unreasonable under § 2254(d) is all the
> more difficult.  The standards created by *Strickland* and
> § 2254(d) are both "highly deferential," *id.*, at 689, 104
> S. Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7,
> 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and when the
> two apply in tandem, review is "doubly" so, *Knowles [v.
> Mirzayance*], 556 U.S., at ----, 129 S. Ct. at 1420
> [(2009)].  The *Strickland* standard is a general one, so
> the range of reasonable applications is substantial.  556
> U.S., at ----, 129 S. Ct. at 1420.  Federal habeas courts
> must guard against the danger of equating
> unreasonableness under *Strickland* with unreasonableness
> under § 2254(d).  When § 2254(d) applies, the question is
> not whether counsel's actions were reasonable.  The
> question is whether there is any reasonable argument that
> counsel satisfied *Strickland*'s deferential standard.

*Id.*

The Court of Criminal Appeals summarized the testimony
presented at the post-conviction hearing as follows:

At the post-conviction court's hearing on the petition, Petitioner's trial counsel, who had practiced criminal law since 1993, recalled that she met with Petitioner "numerous times" prior to trial and that she prepared the trial strategy with his assistance. Counsel said the State offered a fifteen-year sentence if Petitioner pled guilty. However, Petitioner refused the offer and insisted on going to trial. Petitioner was upset because the police had never interviewed him regarding the shooting. Petitioner believed that the police investigation was "shoddy." Counsel testified that Sergeant Prewitt was called in order to support the defense claims that the investigation was inadequate.

Counsel testified that she did not object when the State asked Officer Bishop during its case-in-chief whether Petitioner spoke to the officer while he was at the hospital. She explained that it was not objectionable given the defense's theory of the case. In particular, trial counsel explained that although "on the surface" such questioning might be objectionable, "one of the things that [Petitioner] really wanted to point out during this trial was self-defense and the fact that Miss Washington had scratched his eyes out." Consequently, while the questions "could have been interpreted" as commenting on Petitioner's post-arrest silence, "as far as the defense theory goes for self-defense, that was something that [Petitioner] wanted . . . to be known to the jury." Trial counsel also recalled that because she was unable to interview Officer Bishop before the trial, she did not know what his answer would be and thought that it could be helpful to the defense.

Trial counsel testified that she questioned Officer Bishop about whether he interviewed Petitioner at the hospital shortly after the incident. She said she did so because she wanted to draw out that Petitioner was physically incapable of participating in an interview "because he had been so maimed by Mr. Davis."

Trial counsel was then asked about why she questioned Officer Bishop about whether "anyone ever interview[ed]" Petitioner. She explained that Petitioner "was very adamant about the fact that he was actually the victim of a crime and no one ever took a statement from him." Petitioner "wanted that to be known." Trial counsel further testified that she advised the prosecutor that Petitioner wanted to give a statement but the

prosecutor "was not interested." She added that Petitioner "was upset and offended by the fact that the State of Tennessee had never asked him his side of what happened." On cross-examination, trial counsel explained that eliciting this testimony was part of her trial strategy, and thus "there were multiple reasons why [she was] bringing [it] up in trial."

Trial counsel's testimony then turned to the examinations of Sergeant Prewitt. She testified that she asked Sergeant Prewitt whether he took any statements from Petitioner because the defense was "trying to point out during the trial . . . that there was shoddy investigation. And by asking these types of questions, [trial counsel] thought that that would help . . . further that point." She recalled that she also asked Sergeant Prewitt whether he "questioned the neighbors" so that the jury could "get a full feel of exactly what happened." In short, as trial counsel testified during cross-examination, she asked Sergeant Prewitt these questions as "part of [the defense's] theory of the case." Trial counsel also testified that when the State asked Sergeant Prewitt on cross-examination if Petitioner ever came to the police to give a statement she did not think an objection was appropriate because she had "already opened the door to [those] types of questions."

During Petitioner's testimony at trial, trial counsel asked Petitioner whether he was "ever offered a chance to make a statement." Petitioner responded that he was not and explained why he thought he was not given such a chance. At the post-conviction hearing, trial counsel testified that she asked these questions because she was "trying to show that during the police investigation . . . [the police] weren't trying to get a feel for the entire story." She explained that Petitioner "wanted his story to be told because he felt that he had been victimized himself, and he felt that that would help his case."

When Petitioner was cross-examined by the State, trial counsel did not object to a line of questions concerning whether Petitioner ever made a statement to the police. At the post-conviction hearing, trial counsel explained that she did not object to the questioning because of all the testimony she elicited on direct examination about Petitioner not being able to make a statement. Trial counsel recalled that, at

Petitioner's "insistence," the defense "opened the door to that line of questioning." Consequently, trial counsel did not "[feel] like that . . . objection would . . . have been well taken by the Court."

Trial counsel's post-conviction testimony then turned to questions regarding the State's closing argument. In particular, trial counsel testified that she declined to object to certain arguments made by the State concerning Petitioner's post-arrest silence because they were simply a recitation of "testimony that was actually brought out during the trial." At other points, trial counsel declined to object because she considered the argument to be the State's "theory of the case," which it is allowed to present at closing. At still other points, such as when the State explained that Petitioner waived his right to remain silent when he took the stand to testify, trial counsel stated that she did not object because the State began by noting that Petitioner did not "have to prove anything." She testified, however, that the State's argument concerning Petitioner's silence while he was in the hospital "got past" her and that she should have objected because the evidence at trial was that Petitioner was physically unable to make a statement at that point. Trial counsel further testified that she did not consider the State to ever be equating Petitioner's silence with guilt. Rather, she interpreted the State's argument to merely be "responding to [Petitioner's] testimony that he'd never been given an opportunity to make a statement." Trial counsel testified that she was familiar with the law concerning a criminal defendant's right to remain silent, however, she explained, "that was something that [Petitioner] was waiving because he wanted to . . . make statements and he wanted to bring it out during the trial that he . . . had never been given an opportunity to make a statement."

Trial counsel recalled that she did not object to the portions of the State's closing argument concerning prosecutorial ethics and the prosecutor's oath "to seek truth and justice" because she believed the State "was referring to some direct testimony given by [Petitioner] . . . that [the prosecutor's] job was to seek convictions." At other points, trial counsel declined to object because she was unable to make sense of the State's argument. But she recalled objecting to the State's argument comparing the prosecutor's obligation to

"seek truth and justice" and a defense attorney's obligation to "zealously represent her client." On cross-examination during the post-conviction hearing, trial counsel testified that she objected to the State's closing at certain points "because of the way [she] felt that [the State] was characterizing the job of defense attorneys." She recalled that the trial court ruled that the State should address the ethical obligations of defense attorneys later in the closing, but the State did not do so. Trial counsel therefore objected again at the conclusion of the State's argument. The trial court said it would give a curative instruction.

Trial counsel testified that she used a novel style in her closing argument. She said she learned of this style during a Tennessee Association of Criminal Defense Lawyers seminar and had used it successfully at prior trials. Trial counsel said that during her closing she assumed the role of Ms. Washington's purported "alter ego," Reecy, to highlight the inconsistencies in the State's case. Trial counsel believed it was an appropriate technique "because of the importance that [Petitioner] gave to the fact that Ms. Washington had this alter ego and the way that this dichotomy of personality caused her to shift from one person to another." She testified that she objected at certain points when the State argued on rebuttal that her closing was "degrading" and "insulting," but that she did not object to all such comments because the State's "comments were aimed at [her] rather than [Petitioner]." Trial counsel testified that she did not "feel [the State's rebuttal] was a personal attack on [her]," but rather indicated that the State "wasn't familiar with the type of closing that [she] was doing."

Regarding the weapon, trial counsel testified that the gun used to shoot Mr. Davis "was not lost or stolen." She recalled that she attempted to determine to whom the gun was registered, but she was unsuccessful. Regardless, the ownership of the gun was not an issue "because it wouldn't have mattered who the gun belonged to" because "[t]he testimony was going to be that [Petitioner] used it to shoot Mr. Davis and shoot at Ms. Washington." Likewise, trial counsel did not have the gun tested for fingerprints "[b]ecause everybody's hands had been on [it]."

Petitioner declined to testify at the post-conviction hearing.

*Morris v. State*, 2010 WL 3970371 at *7-*9.

The Court of Criminal Appeals identified the proper standard for the analysis of Petitioner's claims, stating:

> When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). The petitioner must counter the strong presumption counsel's conduct fell within the range of reasonable professional assistance with which we must begin. *See Strickland*, 466 U.S. at 690. To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Moreover,

>> [b]ecause [the] petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

> *Goad*, 938 S.W.2d at 370 (citing *Strickland*, 466 U.S. at 697).

*Morris v. State*, 2010 WL 3970371 at *10.

<u>Issue 1(a) and Issue 1(b)</u>

<u>Counsel's Failure to Object to the State's Questions
about Petitioner's Post-Arrest Silence During the Trial
and Closing Argument</u>

Morris alleges that counsel should have objected when the
prosecutor questioned the witnesses and cross-examined Petitioner
about Petitioner's post-arrest silence. (Am. Pet., ECF No. 3 at
Page ID # 29-30.) Petitioner also contends that counsel should have
objected when "[t]he Prosecutor spent a substantial portion of his
closing argument essentially telling the jury that Petitioner's
post-arrest silence [was] symbolic of his guilt." (*Id.* at Page ID
# 30.) The State responds that the Tennessee Court of Criminal
Appeals' decision was not contrary to, or an unreasonable
application of, clearly established law or an unreasonable
determination of the facts. (Answer, ECF No. 10 at Page ID # 97.)

The Tennessee Court of Criminal Appeals denied relief, stating:

> As explained above, Petitioner asserted that he was
> the actual victim. He claimed that Ms. Washington
> invited him to her house and that upon his arrival he was
> attacked by Ms. Washington and Mr. Davis.
>
> Petitioner chose not to tell anyone in law
> enforcement his version of the events until he took the
> stand. There is no dispute that he did not wait for the
> police at the scene, nor did he go directly to the police
> afterward. In fact, he did not see the police until he
> was in the hospital where, both sides agree, he was
> unable to communicate. He was placed under arrest at the
> hospital, but he was not questioned and, according to the
> record, was not informed of his *Miranda* rights. He then
> withheld his version of the events until trial. The
> police never came to him for an interview, and he did not
> go to the police requesting one. These facts are largely
> undisputed.

As explained above, the defense's theory was that Petitioner was the victim and that the police conducted a sloppy, one-sided investigation. In laying out that theory, trial counsel repeatedly asked the police whether they interviewed Petitioner in order to elicit that they had never talked with him. Trial counsel called Sergeant Prewitt as a defense witness to make that point. Furthermore, Petitioner himself testified to the same effect.

Responding to Petitioner's theory, the State asked both Petitioner and Sergeant Prewitt whether Petitioner ever volunteered a statement. It did so to elicit the fact that Petitioner never told anyone in law enforcement that he believed he was the victim of a crime, and was thus wrongfully accused, until the day he took the witness stand at trial. At closing, the State repeatedly argued that Petitioner's silence between his arrest and trial indicated that his story was not credible. Indeed, it asserted that Petitioner remained silent specifically so that the State could not investigate his story because he knew it was false. Trial counsel did not object as the State elicited this testimony and made these closing arguments.

Petitioner claims trial counsel's decision to not object to either the State's questioning or its closing rendered her ineffective because he had a constitutional right to remain silent and to not have that silence held against him. In particular, Petitioner contends that counsel should have objected during the following cross-examination exchange between the State and Sergeant Prewitt, whom the defense called as a witness as a part of its case:

Q.   You've already told [trial counsel] that you could not get a statement from [Petitioner]; is that correct:

A.   Correct.

Q.   Once a defendant is charged with a crime and has a lawyer can you go talk to him?

A.   Not unless he wants to talk to us.

Q.   Has [Petitioner] ever called you and told you he wanted to talk to you?

A.   No.

Q.   Has [Petitioner] ever called you or anybody in your
     office and told you that he wanted to give you his
     version of what happened?

A.   No.

Petitioner also points to a number of the State's
questions to him during cross-examination as being
impermissible for impeachment.  For example, Petitioner
complains that trial counsel should have objected during
this exchange:

Q.   [Petitioner], how many time have you been in this court?

A.   You know, several times.

Q.   How many?

A.   Approximately five, maybe six.

Q.   Now you told the jury that you never told anybody in law
     enforcement that somebody tried to kill you; is that
     correct?

A.   I said I never told those officers somebody tried to kill
     me.

Q.   You never picked up a phone after you were well to call
     any police officers to say, look, I need to tell you what
     happened on May 18, 2002, these folks attacked me.  You
     never did that, did you?

A.   No.  Reason being, I was already charged for - I
     automatically assumed they done charged me.  I
     automatically assumed that this is going to have to come
     out in court.  And, you know, you automatically assumed
     that if they'd come interviewed and you already charged
     with a crime, you know, you just assume that, hey, the
     police is going to believe their side and not yours.
     It's just a common assumption.

Similarly, Petitioner contends counsel should have
objected to several statements the State made during its
closing argument.  While there are many specific
statements about which Petitioner complains, the
following illustrates the nature of the complaint:

33

And I emphasize it and I put it in bold writing, that he never in told anybody that ridiculous tale until he told you yesterday, eighteen months after this shooting took place. I asked [Petitioner] yesterday . . . how many times have you been in this courtroom? How many times you have told anybody in law enforcement this ridiculous theory about how you're trying to protect yourself from Teresa Washington and James Davis. How many times? Zero.

How many times have you told me . . . that you need to look into this because this ain't right, these folks are trying to railroad me. I'm defending myself. . . .

If at any point in the past six hundred and twenty-two days or whatever it's been now that he has been in custody, charged with trying to kill two people, if he thought any of that was true, he could have had that investigated by some law enforcement agency if he wanted to. He did not want it investigated because he knew it was not the truth. He knew it was not justice. For the same reasons he fled . . . are the same reason why he withheld this information from law enforcement because he knows it is not the truth. So he comes to court and he takes one shot, roll of the dice, let me, let me throw it out there one time, drop it on the jury. And let me see if I can get at least one juror to say, well, maybe he's telling the truth. And that's why he waited until January 28th, 2004, to tell somebody about this ridiculous self-defense argument.

We agree with the post-conviction court that trial counsel's decision to not object did not render her assistance ineffective.

Petitioner is correct that he had the right to remain silent. U.S. Const. amend. V; *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). However, "[o]nce a defendant decides to testify," he "cast[s] aside his cloak of silence," and the Fifth Amendment allows him to be subjected to at least some degree of impeachment based on his prior silence. *Jenkins v. Anderson*, 447 U.S. 231, 238, 100 S. Ct. 2124, 65 L. Ed. 2d 86 (1980). Thus, the Fifth Amendment permits a defendant to be impeached "by use of prearrest silence." *Id.* at 240. Generally, a defendant may not be

impeached based on his silence after he was given a *Miranda* warning. *See Doyle v. Ohio*, 426 U.S. 610, 619–20, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). *Doyle* reasoned that when a defendant receives a *Miranda* warning, the government induces, or at least arguably induces, subsequent silence. *See id.* at 617–19. Inducement is not present when the government has arrested an individual but not yet informed him of his *Miranda* rights. *See Fletcher v. Weir*, 455 U.S. 603, 605–07, 102 S. Ct. 1309, 71 L. Ed. 2d 490 (1982) (per curiam). Consequently, it does not violate due process to allow the State to impeach a defendant with evidence of post-arrest, but pre-*Miranda* warning, silence. *Id.* at 606–07.

These United States Supreme Court decisions provide the outer boundary of permissible impeachment allowed by the Fifth Amendment. As *Jenkins* notes, "[e]ach jurisdiction may formulate its own rules of evidence to determine when prior silence is so inconsistent with present statements that impeachment by reference to such silence is probative." 447 U.S. at 239.

Prior to *Doyle*, *Jenkins*, and *Weir*, our supreme court addressed the issue of impeaching a defendant with his prior silence in *Braden v. State*, 534 S.W.2d 657 (Tenn. 1976). In *Braden*, the court explained that in order to "strike a balance between protecting the self-incrimination bar of the Fifth Amendment and allowing full testing of the truth of defendant's trial testimony . . . evidence of pretrial silence of the defendant must be admitted with caution and then only where such silence is patently inconsistent with defendant's testimony." *Id.* at 660. Thus, evidence elicited for "the impeaching effect of any prior inconsistent actions" by the defendant, including prior silence, could be elicited in certain circumstances. *Id.*

The *Braden* rule was obviously limited by the Doyle line of cases. But as this court explained in *State v. Chris Haire*, "*Braden*'s 'patently inconsistent' qualification is still viable in the factual context [of post-arrest, pre-*Miranda* warning silence]." No. E2000–01636–CCA–R3–CD, 2002 WL 83604, at *15 (Tenn. Crim. App. at Knoxville, Jan. 22, 2002). "The result is that Tennessee restricts impeachment use of a defendant's post-arrest silence that precedes *Miranda* warnings to those situations wherein it is patently or blatantly

inconsistent with trial testimony." *Id.*; *see also State v. Jonathan D. Rosenbalm*, No. E2002-00324-CCAR3-CD, 2002 WL 31746708, at *5-6 (Tenn. Crim. App. at Knoxville, Dec. 9, 2002).

Although there is a paucity of Tennessee cases demonstrating the types of situations in which the State can use a defendant's silence for impeachment, several cases from other jurisdictions provide useful illustrations. In *State v. Cockrell*, for instance, the Wisconsin Court of Appeals dealt with a defendant who was convicted of shooting someone in a car that had pulled up next to him at a McDonald's drive-through. 306 Wis.2d 52, 741 N.W.2d 267, 269 (Wis. Ct. App. 2007). When Cockrell turned himself in to the police, he told them about his history with the victim. *Id.* However, he refused to speak to the officers about the incident itself until he had counsel. *Id.* He remained silent until trial, when he testified that he acted in self-defense, claiming that the victim pointed a gun at him first. *See id.* at 269-70. Cockrell also testified that he refused to tell the police about the incident without counsel "because things can be misinterpreted or written down incorrectly." *Id.* at 270. On cross-examination, the state attempted to impeach Cockrell's testimony by questioning him about his previous silence. *Id.* On appeal, Cockrell challenged the state's questions as a violation of his right to remain silent. *Id.* The court explained that there are several situations in which the state's use of a defendant's post-*Miranda* silence for impeachment is not a violation of due process. *See id.* at 270-72. For instance, the state may do so "where the defendant's testimony conveys that he or she cooperated with the police," "where the defendant volunteered on direct his reason for not telling the police his version of the crime," and "where the defendant testified that he attempted to tell the officers what happened but they would not let him speak." *Id.* at 271-72. The court concluded that the state's use of Cockrell's post-*Miranda* silence was not "fundamentally unfair" because he "initiated the topic of why he chose to remain silent [and] his explanation put him in a better position than had he not mentioned the reason." *Id.* at 275. Moreover, the state's use of Cockrell's silence was limited to impeaching his explanation, the state did not equate that silence to guilt. *See id.* at 275-76.

The court's reasoning in *Cockrell* is similar to that in *United States ex rel. Saulsbury v. Greer*, 702 F.2d 651 (7th Cir. 1983). There, the court explained that

> Once [a] reason [for the defendant's prior silence] was solicited upon direct examination it was not fundamentally unfair for the prosecution, upon cross-examination, to attack the credibility of that explanation by eliciting testimony that the defendant had failed to come forward with his exculpatory explanation long after the *Miranda* warnings and after circumstances had made the need for such an explanation, if it existed, far more compelling.

*Id.* at 655–56. Because the defendant had "ventured" so far as to give an explanation for his silence, he "could not erect a constitutional barrier against the state exploring the soundness of that explanation by measuring it against the defendant's subsequent failure to assert it" earlier. *Id.* at 656.

In *State v. Alo*, the court likewise found that the state could impeach a defendant's exculpatory version of the facts by reference to his prior silence. 57 Haw. 418, 558 P.2d 1012 (Haw. 1976). There, Alo was charged with attempted murder after his girlfriend claimed that he beat her, drove her to a secluded area, shot her, and left. *Id.* at 1013–14. The victim survived and immediately reported the crime. *Id.* at 1014. The police quickly found Alo walking toward his apartment. *Id.* While he declined to give a statement at the police station, at trial Alo claimed that he told the officer that stopped him that he had been on a walk when the incident occurred. *Id.* at 1014–15. On cross-examination, the state elicited testimony that Alo had not told the police his version of the events when he was at the station. *Id.* at 1015. On appeal, the court explained that "the prosecution was not bound to accept as true the defendant's testimony on direct examination" and it "had the right to determine whether and exactly to whom the defendant was supposed to have given his exculpatory version." *Id.* Such questions "were a natural and logical sequel to the defendant's testimony," and therefore were "not calculated to penalize the defendant for his silence." *Id.* at 1016.

As these cases make clear, the law does not exclude evidence of a defendant's silence "so that the defendant may freely and falsely create the impression that he has cooperated with the police when, in fact, he has not." *United States v. Fairchild*, 505 F.2d 1378, 1383 (5th Cir. 1975). Even if exclusion of such evidence is ordinarily required by due process, once the defendant broaches the subject of his cooperation or explains his silence, "the bar [is] lowered and he discard[s] the shield which the law had created to protect him." *Id.*

In the present case, the post-conviction court concluded that counsel's decision to refrain from objecting was not deficient because the questions did not intrude on Petitioner's Fifth Amendment rights. In other words, an objection to the State's questions about Petitioner's post-arrest silence would have been overruled. The court concluded that Petitioner's decision to remain silent and not tell law enforcement his version of the events was not deficient because Petitioner's silence "was patently or blatantly inconsistent with his trial testimony," and thus proper fodder for impeachment. It also explained that the questions were valid because Petitioner opened the door to the State's line of attack. Indeed, it credited trial counsel's testimony that Petitioner waived his Fifth Amendment right to silence, and the concomitant right to not have his silence held against him, by virtue of asserting his self-defense-and-shoddy-investigation theory of the case.

We agree with the post-conviction court. We begin by noting that Petitioner does not contend that the defense strategy of arguing that Petitioner was the actual victim and that law enforcement conducted a shoddy investigation was somehow deficient. Nor does he challenge the decision to call Sergeant Prewitt as a defense witness for the purpose of eliciting that the police had not interviewed anyone other than the victims. These critical points lead us to conclude that the post-conviction court did not err in crediting trial counsel's testimony that Petitioner waived his Fifth Amendment rights because "he wanted to bring it out during the trial that he wasn't being given an opportunity or had never been given an opportunity to make a statement."

Petitioner's position thus appears to be that he is allowed to testify and present evidence that, despite his desire to tell his side of the story, the police never gave him an opportunity to make a statement; yet the State is not allowed to point out Petitioner's inconsistent behavior and the fact that he never made any effort to relay his version of the events.  This position goes too far.  Petitioner tried to create the impression that he wanted to cooperate but was thwarted by myopic investigators.  As the court in *Cockrell* wrote, once a defendant explains his silence, "his explanation put[s] him in a better position than had he not mentioned the reason; it [is] not fundamentally unfair for the State on cross-examination to attack the credibility of that explanation by eliciting the testimony that, even after there was a compelling need for him to come forward with his self-defense version of the fight, he did not."  741 N.W.2d at 275 (citing *Saulsbury*, 702 F.2d at 655–56).  In our view, Petitioner opened the door to impeachment based upon his theory of the case.

Moreover, the record makes clear that Petitioner's counsel brought up Petitioner's silence before the State ever asked any of the questions about which he now complains.  Specifically, during the direct examination of Sergeant Prewitt, who was called as a defense witness to show that the police neglected to take statements from anyone other than the victims, trial counsel asked:

Q.   Did you take any other statements in this case?

A.   No. . . . And [Petitioner] couldn't [make a statement] either.

Q.   He was unable to do it?

A.   Yes.

Q.   [Petitioner] was unable to make a statement to you?

A.   Yes.

Q.   At the hospital.  Okay.  At any other time did you attempt after [Petitioner's] release [from the hospital], did you attempt to take a statement from him?

A.   No.

Q.   And so during the conduct of your investigation you never
     got [Petitioner's] side of what happened on [May 18,
     2002] at 680 Glankler?

A.   No.

Q.   Okay.  Ever?

A.   No.

That line of questioning opened the door for the State's
cross-examination about whether Petitioner ever made an
affirmative effort to speak to law enforcement.

    The same is true with respect to the State's
questions during Petitioner's cross-examination.  On
direct examination, trial counsel opened the door by
asking Petitioner:

Q.   Were you ever offered a chance to make a statement to the
     police?

A.   No, Ma'am.

Q.   Okay.  And why were you not given - why in your opinion
     do you think you were not given a chance to make a
     statement to police?

A.   Well, I always thought that if, that according to my
     experiences since I've been down here, which has almost
     been two years, that it's a standard operating procedure
     for the police to come down and interrogate a suspect
     once they get downtown.  I've been down here for going on
     two years and no officer made no attempt to come down and
     interrogate me for nothing or get my opinion on nothing.
     My first time being locked up for an offense like this
     period.

This statement invited the State's cross-examination
questions regarding whether Petitioner affirmatively
sought to make a statement.  Counsel's failure to object
was not deficient because the defense opened the door to
such questions.

    Finally, the defense's strategy made any Fifth
Amendment objection to the State's comments on
Petitioner's pre-trial silence meritless.  As trial
counsel explained, to assert Petitioner's

self-defense-and-shoddy-investigation theory, Petitioner waived his Fifth Amendment right to remain silent and to not have that silence held against him.  The State's closing response to Petitioner's theory therefore did not violate Petitioner's Fifth Amendment rights, and any objection to that effect would not have been sustained.

Petitioner asserts that, even if he did invite the State's use of his post-arrest silence, the State went far beyond using that silence for impeachment purposes and instead used it to equate his silence with guilt. Petitioner cites this court's decision in *State v. Eric Flemming*, No. 01C01-9709-CR-00418, 1999 WL 20800 (Tenn. Crim. App. at Nashville, Jan. 20, 1999), as support for his position.  *Flemming* involved an aggravated robbery. Upon arrest, Mr. Flemming claimed that he knew nothing of the crime except that he had heard the name of the perpetrator.  *Id.* at *5.  Mr. Flemming stopped talking to the police "when it became clear that they did not believe him."  *Id.*  At trial, the State used Mr. Flemming's silence to argue that he refused to speak in order to make sure he did not tell a story that police could prove was false.  *See id.* at 11.  This, we said, "was an obvious violation of [Mr. Flemming's] Fifth Amendment right to silence."  *Id.*

Although the State made similar "silence equates to guilt" comments during its closing in the present case, this case contains a subtle, but critical, difference. Whereas Mr. Flemming asserted that he knew nothing about the crime other than the name he had heard, Petitioner does not dispute that he shot Mr. Davis.  Petitioner claims he was defending himself as Ms. Washington and Mr. Davis attempted to murder him.  The context of the two cases is important.  If Mr. Flemming's credibility was impeached, it merely meant his statement that he did not know anything about the crime other than the perpetrator's name cannot be believed.  However, he could still assert that he did not actually commit the crime. The implications for impeaching Petitioner's testimony about his version of events are much different.  As we have noted, Petitioner admitted that he shot Mr. Davis. The only question was why.  Petitioner testified that he acted in self-defense.  But if the State impeached the credibility of Petitioner's claim that he was attacked, then the self-defense theory collapses.  In *Flemming*, the jumps from (1) silence to (2) discrediting Mr. Flemming's statement that he knew nothing about the crime to (3)

guilt are too big.  But in Petitioner's case, it is only logical that if his statement that he was attacked cannot be believed, then there is no legal justification for shooting Mr. Davis.

Petitioner's ineffective assistance of counsel claims concerning his Fifth Amendment right to silence fail.

*Morris v. State*, 2010 WL 3970371 at *10-*17.

The Tennessee Court of Criminal Appeals cited and applied the Supreme Court's decision in *Strickland*.  *Id.* at *10.  Based on this Court's review of the transcript of Petitioner's trial, (Tr. of Trial, Addendum I, Volumes 3-6, ECF Nos. 11-3-11-6, Page ID # 315-844), and counsel's testimony at the post-conviction hearing (Tr. of Post-Conviction Hearing ("H'rg."), Addendum 3, Volumes 2-3, ECF Nos. 12-5-12-6, Page ID # 1317-1415), the decision of the Tennessee Court of Criminal Appeals did not "result[] in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

Counsel presented the defense that Morris requested.  Morris does not allege otherwise.  Morris wanted the opportunity to portray himself as the victim and to explain why he chose to remain silent. The chosen defense opened the door to the questions during cross-examination that Petitioner now contends were objectionable.  The State was permitted to point out Petitioner's inconsistent behavior. Counsel did not perform deficiently by failing to make baseless objections.  This claim is without merit and is DENIED.

<u>Issue 1(c)</u>

<u>Counsel's Failure to Object to Other Instances of
Prosecutorial Misconduct During Closing Argument</u>

Morris alleges that trial counsel was ineffective for failing to object when the prosecutor expressed personal opinions as to Petitioner's guilt, made statements calculated to inflame the jury, made personal attacks against defense counsel, and made statements that shifted the burden of proof from the State to Defendant. (Am. Pet. ECF No. 3 at Page ID # 30.) The State responds that Petitioner has failed show that the Tennessee courts' rejection of this issue was contrary to any United States Supreme Court precedent or was based on an unreasonable determination of the facts based on the evidence presented. (Answer, ECF No. 10 at Page ID # 106.)

The Tennessee Court of Criminal Appeals denied relief on this issue, stating:

> Petitioner next contends that trial counsel was ineffective for failing to object to several episodes of alleged prosecutorial misconduct during the State's closing arguments. He relies upon this court's decision in *State v. Goltz*, in which we outlined "five general areas of prosecutorial misconduct" that can occur during closing argument: (1) intentionally misleading or misstating the evidence; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt; (3) making statements calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than the guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge. 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003). In addition, he notes that "[t]he prosecution is not permitted to reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial." *State v. Gann*, 251 S.W.3d 446, 460

(Tenn. Crim. App. 2007). Petitioner contends that the State violated several of these principles at various times during its closing argument.

Petitioner first contends the State crossed the line by reminding the jury that it "took an oath that if the State of Tennessee presented proof . . . beyond a reasonable doubt that the defendant attempted to kill [the victims] . . . [the jury] would . . . find the defendant guilty," and then later asserting a guilty verdict "is the verdict that truth dictates and that justice demands and any other verdict would be a violation of the oath that [the jurors] took to return a true verdict." Petitioner claims the State's argument expressed a personal belief or opinion as to the truth or falsity of the evidence of Petitioner's guilt, made statements calculated to inflame the passions or prejudices of the jury, and intentionally referred to or argued facts outside the record that are not matters of common public knowledge, all in violation of *Goltz*, and thus counsel should have objected. *See* 111 S.W.3d at 6.

We disagree. Nothing in the passage quoted above expresses the prosecutor's "*personal* belief or opinion." *Goltz*, 111 S.W.3d at 6 (emphasis added). We read these statements as counsel's articulation of the State's position. Nor do we read the statement as one designed to inflame the passions or prejudices of the jury or injecting broader issues into the trial. It simply reminded the jury of its oath and asserted the State's position that it had met its burden, thereby necessitating, in the State's view, a guilty verdict.

Six other passages to which Petitioner points are more disturbing. Those passages are as follows:

> How many times have you told me, [Petitioner], that you need to look into this because this ain't right, these folks are trying to railroad me. I'm defending myself. . . . [Petitioner] went, well that's not [the prosecutor's] job. You're trying to convict me. I don't take an oath to convict anybody. I don't take an oath to convict [Petitioner] or any defendant ever of any crime. The oath that I took before I became a prosecutor was to seek truth and justice. Truth and justice. It would be unethical for me as a prosecutor to present facts to you that I don't believe are

factually based, there's a factual basis for that.
It would be unethical for me to continue to
prosecute a case in which I don't believe there's
some good-faith basis.

. . .

    This defendant is guilty.  [Trial counsel] has
a job to zealously represent her client.  That's the
oath she takes as a defense lawyer.  To zealously
represent her client.  I don't take an oath to
zealously represent the people of the State of
Tennessee.  I don't take an oath to zealously
represent the people of Shelby County, Tennessee.
I take an oath to seek truth and justice.

. . .

    I don't represent the government.  I represent
the people of the State of Tennessee.  I represent
the State of Tennessee, not the government.  I
represent specifically people here in Shelby County,
Tennessee.  So when people stand up and start
telling you that [the prosecutor] represents the
government, I don't know what government that is.
I represent you, your neighbor, your loved ones,
people in this community, that's who I represent.

. . .

    If the truth is [Petitioner] is not guilty
based on the proof that I've submitted to you, that
the State of Tennessee has presented in court, it is
my oath, my duty, my obligations to stand before you
and say, ladies and gentlemen of the jury, I haven't
proven this case.  I can't ask you to find
[Petitioner] guilty.  That would be wrong.  It's a
violation of my ethical duties in order for me to
stand here and tell you to find this man guilty if
there is no facts to prove him guilty.

. . .

    [Petitioner] is still in jail six hundred and
twenty-two plus days because that's where he
deserves to be.  He is still in jail and not running
free on bond because he is a danger to this
community.  He is in jail for six hundred and

twenty-two some-odd days because he is a threat to kill somebody. Judge Bennett was not fooled by anybody when Judge Bennett made the decision to revoke this defendant's bond and to keep him in jail. And for some lawyer to stand up here and tell you that this judge has been fooled is absolutely, absolutely an insult. And you should all be offended by those statements from [trial counsel].

[Petitioner] is in jail for six hundred and twenty-two days because he deserves to be in jail, not for six hundred and twenty-two days but for a lot longer than six hundred and twenty-two days.

. . .

It is true that prosecutors have an obligation to seek truth and justice. *See State v. David Lynn Jordan*, 325 S.W.3d 1, 64 (Tenn. Sept. 22, 2010) (quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935)). But the prosecutor's statements quoted above combine to form a troubling theme: that the prosecutor, who represents the jurors, their families, and their friends, and who is ethically obligated to seek only "truth and justice" and withdraw the case if the evidence is insufficient, believes Petitioner is guilty; Petitioner's defense attorney, on the other hand, who is only obliged to "zealous[ly] represent her client" and is not obliged to seek truth and justice, has insulted the jury; and the trial judge, whom the jury should see as neutral arbiter of the law, agrees that Petitioner is guilty. That is the underlying message of these statements.

Petitioner asserts that trial counsel should have objected to these statements as violations of the principles articulated in *Goltz* and *Gann*. The record reflects that trial counsel did object to portions of the State's closing. In particular, the defense argued that the State improperly implied that the defense attorneys were not obliged to seek truth and justice but were instead permitted to present a version they knew to be false. The objection was noted, but overruled. However, when counsel was asked why she did not object to each individual statement, counsel said that she did not believe the objections were necessary or would be well-taken or that she was contemplating which objection to raise. The post-conviction court concluded that the

46

statements were not improper because the prosecution was responding to Petitioner's assertion from the witness stand that he did not tell the prosecutor his version of the story because the prosecutor was only interested in convicting him and because, in the context of this "hard-fought" case, the statements were not out of line.

While we agree that the prosecutor's statements are dangerously close to the lines staked out by *Goltz* and *Gann*, we do not believe counsel's conduct amounts to ineffective assistance warranting relief. Regardless, Petitioner has not established prejudice. As a result, it is unnecessary to determine whether the fact that counsel made only a few objections to the State's closing satisfies the deficiency prong of the *Strickland* analysis.

Our supreme court has recently reminded the bar "that closing arguments must be (1) temperate; (2) predicated on the evidence adduced at trial; and (3) pertinent to the issues." *Jordan*, 325 S.W.3d at 64. The court added that "because a prosecutor's role is to seek justice rather than simply advocate, the State's prerogative during argument is more limited than that of other parties." *Id.* Yet, because "[c]losing arguments are an important tool for both parties during the trial process . . . attorneys are usually given wide latitude in the scope of their arguments" and "[t]rial courts are accorded wide discretion in their control of those arguments." *State v. Berry*, 141 S.W.3d 549, 586 (Tenn. 2004). Given the trial court's tepid reaction to the defense's objections at closing, we think it unlikely the trial court would have sustained additional objections. Consequently, Petitioner would have to clearly establish that the statements "affected the verdict to [his] prejudice." *Id.* (quotation marks omitted); *see also Goltz*, 111 S.W.3d at 5; *State v. Middlebrooks*, 995 S.W.2d 550, 560 (Tenn. 1999).

We consider five factors in evaluating whether prosecutorial misconduct during closing justifies reversing the verdict:

1) the conduct complained of, viewed in light of the facts and circumstances of the case; 2) the curative measures undertaken by the court and the prosecution; 3) the intent of the prosecutor in making the improper arguments; 4) the cumulative

effect of the improper conduct and any other errors in the record; and 5) the relative strength and weakness of the case.

*Berry*, 141 S.W.3d at 586; *see also Jordan*, 325 S.W.3d at 65. We conclude that these factors would not have weighed in favor of reversing Petitioner's conviction. We agree with the post-conviction court that the record indicates that the State's comments came in the midst of a "hard-fought" case. Moreover, the comments were partly in response to Petitioner's testimony that he did not tell the prosecutor his version of the story because the prosecutor's job was to convict him.[10] The first factor is thus neutral. Factors (2) and (3) weigh in favor of the Petitioner because the trial court took no curative measures specifically tailored to counter the statements and the prosecutor's motive for making them appears to have been to combat defense counsel's theory of the case by boosting the jury's faith in the prosecutor's version of events.[11] But even though these factors weigh somewhat in Petitioner's favor, they are outweighed by the remaining two. We do not believe the cumulative effect of these statements and any other errors in the record caused the jury to lose sight of its duty. Moreover, the evidence against Petitioner was devastating. Each of the two victims, one of whom had been shot in the chest, testified that Petitioner came to Ms. Washington's house with a gun and shot Mr. Davis, disputing Petitioner's self-defense claim. They immediately told their story to the police and did so at separate times, without the

---

[10] In that regard, the State's comments appear to be like those in *Jordan*, where the State attempted to "strike back" at the defense's argument. *See* 325 S.W.3d at 65. As the supreme court explained in *Jordan*, "[w]hile the prosecutor reached too far in his argument, it appears that the prosecutor was at least trying to place his argument in some overall context triggered by the argument of defense counsel." *Id.*

[11] Again, *Jordan* is instructive. It reminds the bar "that it is incumbent upon defense counsel to object contemporaneously whenever it deems the prosecution to be making improper argument," so that the trial court has the opportunity to evaluate the argument and take any curative measures it deems necessary. 325 S.W.3d at 57. The court warned that failure to do so waives the issue. *Id.* However, the court also noted that even absent an objection, the trial court "may intervene *sua sponte* when prosecutorial argument is clearly improper." *Id.* at 57 n. 14.

We also note that, as in *Jordan*, the trial court in this case gave the jury a general instruction that counsels' arguments are not evidence and should be disregarded if they contradict the jurors' recollection of the evidence. *See id.* at 66.

opportunity to communicate beforehand. Petitioner's self-defense argument was discredited when Petitioner was impeached with his failure to tell anyone in law enforcement his version of the story. The prosecutor's closing statements at issue did not concern those facts. Thus, we conclude the statements were superfluous to the jury's ultimate conclusion, which it made in light of the overwhelming evidence of Petitioner's guilt. Consequently, we do not believe Petitioner has established that he was prejudiced by counsel's failure to object to the prosecutor's statements.

The next set of statements that Petitioner contends were improper and warranted an objection involved the State's commentary on trial counsel's closing argument. As noted above, trial counsel acknowledged at the post-conviction hearing that her closing argument was "novel." As we explained, during the closing, trial counsel told the story of the case from the perspective of Ms. Washington's purported alter ego, Reecy. In rebuttal, the State dismissed trial counsel's closing as a "comedy routine" that was "degrading" and "insulting." Petitioner, citing *Gann*, asserts that the State's commentary improperly attacked counsel and her tactics.

The post-conviction court concluded that trial counsel was not deficient because these statements were not improper personal attacks. Instead, the comments responded to trial counsel's unique closing and focused on the defense's theory of the case.

We agree with the post-conviction court's conclusion. We read these statements to be comments upon the defense's theory, rather than personal comments about trial counsel. Trial counsel testified at the post-conviction hearing that she had the same reaction to the statements. We thus conclude that the *Berry* factors counsel the same conclusion as we reached above. *See* 141 S.W.3d at 586.

The final set of comments to which, Petitioner contends, trial counsel should have objected concerned Petitioner's burden of proof. The two statements about which Petitioner complains are as follows:

If at any point [Petitioner] thought any of this was true, and he doesn't have to prove anything because that's the State's burden, but once he starts

presenting facts to you, you have the same
obligation to view what he tells you as you do in
what the State presents. If he presents something
to you, if he chooses to, it's his obligation to
prove to you that it's true. It is not the State's
obligation to prove to you that it's not true. He
made that choice to put that ridiculous self-defense
argument before you. It's his obligation to prove
that's true.

. . .

What you've heard in court absolutely from
[Petitioner]—and I'll state again, [Petitioner] does
not have to present any proof. He doesn't have to
prove anything. But once he takes the stand and
tells you something, he presents that proof, it is
absolutely his obligation to convince you that what
he is saying is correct. It's his obligation to
convince you that he is credible. It's his
obligation to convince you that he is a truth
teller.

Petitioner contends that such statements improperly
indicate that Petitioner bears the burden of proof in his
self-defense claim. *See State v. Belser*, 945 S.W.2d 776,
782 (Tenn. Crim. App. 1996) (noting that the State "has
the burden of proving beyond a reasonable doubt that the
defendant did not act in self-defense"). As a result,
Petitioner argues, counsel was deficient for not
objecting.

We are not persuaded. The State repeatedly stated
that Petitioner was presumed innocent and did not have to
prove anything. The State also accurately noted that
Petitioner bore the burden of persuading the jury that he
was credible. *See, e.g.*, 7 Tenn. Prac. Pattern Jury
Instr. T.P.I.—Crim. 42.04. Counsel was therefore not
deficient in withholding an objection.

After a thorough review, we conclude that, as the
post-conviction court commented, the case was
hard-fought. Parts of the State's closing may have been
inappropriate, but Petitioner is not entitled to relief.
The statements either did not warrant further objection
or do not provide a basis for finding prejudice.

*Morris v. State*, 2010 WL 3970371 at *17-*21.

Under federal law, any prosecutorial comment or argument that induces the jury to accept the prosecutor's opinion to the detriment of the facts of the case, is improper. *United States v. Young*, 470 U.S. 1, 18-19, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985) ("[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context . . . ."). At times, questionable prosecutorial comments may be proper because they are "made in response to the argument and strategy of defense counsel." *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000). Thus, even if "the prosecutor's remarks exceeded the permissible bounds," the issue remains whether the remark was harmless under all of the circumstances. *Young*, 470 U.S. 13 n. 10.

The cited instances of the prosecutor's alleged misconduct occurred during the prosecutor's closing argument and rebuttal. *See Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) ("In order to constitute the denial of a fair trial, prosecutorial misconduct must be so pronounced and persistent that it permeates the entire atmosphere of the trial." (internal quotation marks omitted)). The majority of the comments Morris targets came directly in response to defense counsel's closing argument, *see United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir. 1996) (finding prejudicial effect minimized where defense counsel's argument invited the improper statements of prosecutor's personal opinion).

Trial counsel testified at the post-conviction hearing that she did not object . . . because it was the State's "argument . . . their theory of the case" and because the prosecutor "was referring to some direct testimony given by Mr. Morris where Mr. Morris was indicating that . . . Mr. Coffee was trying - - that his job was to seek convictions, and he was indicating that that wasn't such that his job was prosecutorial in nature." (Tr. of Post-Conviction Hr'g, Addendum 3, Volume 2, ECF No. 12-5 at Page ID # 1352, Volume 3, ECF No. 12-6 at Page ID # 1371.)

As to the prosecutor's characterization of trial counsel's closing argument, counsel testified that the prosecutor "was pretty much attacking the way that I chose to close, and basically his comments were aimed at me rather than Mr. Morris or the case . . . he was just talking about the way that I chose to close . . . it was personally objectionable to him as far as the way that I closed, but it wasn't improper. (Tr. of Post-Conviction Hr'g, Addendum 3, Volume 3, ECF No. 12-6 at Page ID # 1374.) Counsel further testified that she "didn't feel it was a personal attack on [her]. [She] felt that maybe he wasn't familiar with the type of closing that I was doing. Mr. Coffee and I worked together for a matter of years so, no, I didn't feel like there was a personal attack." (Tr. of Post-Conviction Hr'g, Addendum 3, Volume 3, ECF No. 12-6 at Page ID # 1378-9.) Counsel noted that there was an objection to the prosecutor's implication that defense counsel was doing something

unethical or did not have a duty to present truthful evidence and the record supports her recollection. (Tr. of Post-Conviction Hr'g, Addendum 3, Volume 3, ECF No. 12-6 at Page ID # 1374; Tr. of Trial, Addendum 1, Volume 6, ECF No. 11-6 at Page ID # 797-99.)

Prosecutors should not level personal attacks against defense counsel, and trial courts should not countenance such conduct. *See United States v. Carter*, 236 F.3d 777, 785 (6th Cir. 2001). However, the likelihood that the prosecutor's characterization of defense counsel's closing argument as a comedy routine (Trial Tr., Addendum 1, Volume 6, ECF No. 11-6 at Page ID # 795) significantly impacted the trial is small, as the prosecutor merely accused the defense counsel of being insensitive, and, in any case, the jurors witnessed defense counsel's conduct themselves and could form their own impressions. *Cf. id.* (prosecutor repeatedly accused defense counsel of lying to the jury).

The Court agrees that some of the prosecutor's comments were close to unacceptable, however, the comments did not misstate evidence, were not inflammatory, and did not suggest facts outside the record. Any prejudicial effect was lessened by the fact that the comments were in response to the defense strategy and defense counsel's closing argument. Although defense counsel could have objected to the prosecutor's closing argument and rebuttal, the failure to object was not objectively unreasonable, based on the trial court's lukewarm reaction to counsel's first objection.

Petitioner has not established a reasonable probability that, but for the failure to object, the trial court would have given additional curative instructions or the result of the proceedings would have been different.

The trial judge followed closing arguments with a limiting instruction in response to counsel's objection:

> Ladies and gentlemen, both defense and the state ha[ve] the obligation to seek the truth.

(Trial Tr., Addendum 1, Volume 6, ECF No. 11-6 at Page ID # 818.) The judge declined to expand the instruction to specifically cover the prosecutor's comment that trial counsel's reference to the prosecutor as "[t]he government . . . [was] a little trick that defense lawyers like." (Trial Tr., Addendum 1, Volume 6, ECF No. 11-6 at Page ID # 797, 809.) The judge gave a second, appropriate limiting instruction:

> Statements, arguments, and remarks of counsel are intended to help you understand the evidence and applying the law, but they are not evidence. If any statements were made that you believe are not supported by the evidence, you should disregard them.

(Trial Tr., Addendum 1, Volume 6, ECF No. 11-6 at Page ID # 813.)

Although a general instruction at the end of closing statements may not be sufficient to cure the full impact of a prosecutor's improper remarks in every case, *see, e.g.*, *United States v. Carter*, 236 F.3d 777, 787 (6th Cir. 2001) ("We believe that measures more substantial than a general instruction that 'objections or arguments made by lawyers are not evidence in the case' were needed to cure

the prejudicial effect of the prosecutor's comments during closing arguments." (footnote omitted)), the instruction does lessen the impact of such remarks, as the jury is presumed to follow all of the court's instructions, *see United States v. Sivils*, 960 F.2d 587, 594 (6th Cir.1992), not just the contemporaneous ones.

Morris' brief on post-conviction appeal failed to offer, much less develop, any specific factual allegations to show how he was prejudiced as a result of the lack of objections. Instead, he simply asserted that "[t]rial counsel was deficient for failing to timely object" and "[t]he jury had to have been confused" "despite the trial court correctly instruct[ing] the jury that the State must prove beyond a reasonable doubt that Petitioner did not act in self-defense before Petitioner could be convicted." (Post-conviction Appeal Brief ("Br."), Addendum 4, Document 1, ECF No. 13-8 at Page ID # 2320-32). In the absence of any explanation in the state court, or in this Court for that matter, as to how counsel's failure to object harmed Morris, there is nothing to support a finding that he suffered any prejudice from counsel's alleged shortcoming.

Morris has not satisfied his burden of showing that he suffered any prejudice from the lack of objections to the prosecutor's argument and rebuttal. *Weygandt v. Ducharme*, 774 F.2d 1491, 1493 (9th Cir. 1985) ("Although [petitioner's] attorney should have objected to the prosecutor's improper remarks, his failure to do so, evaluated in light of the overwhelming evidence of guilt presented

at trial, did not so prejudice [the petitioner] as to deprive him of a fair trial."). The state courts' rejection of this claim of ineffective assistance of counsel was not an objectively unreasonable application of *Strickland*. Because the state courts' determination was reasonable and in accord with established federal law, Morris is not entitled to relief on this claim. Issue 1(c) is DENIED.

<u>Issue 1(f)</u>

<u>Counsel's Failure to Adequately Investigate the Case by Having the Pistol, Casing, Clip, and Unfired Bullet Tested for Fingerprints</u>

Petitioner contends that counsel performed deficiently by failing to have the pistol, casing, clip, and unfired bullet tested for fingerprints. (Am. Pet., ECF No. 3 at Page ID # 30-31.) The State responds that the Tennessee Court of Criminal Appeals relied on the relevant Supreme Court precedent and the decision was not based on an unreasonable determination of the facts in light of the evidence presented. (Answer, ECF No. 10 at Page ID # 111.)

The Tennessee Court of Criminal Appeals reviewed this claim and determined:

> Petitioner contends that trial counsel was deficient for failing to seek fingerprint evidence on the magazine and unfired bullet in the .380 handgun used to shoot Mr. Davis. However, Petitioner has failed to present any evidence to show that there were any fingerprints on the magazine or bullet, let alone that such prints would have helped his defense. As Petitioner correctly notes, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by

56

the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). That is true in cases concerning possible fingerprint evidence. *See Edward R. Forester v. State*, No. E2005-01922-CCA-R3-PC, 2006 WL 2706150, at *8 (Tenn. Crim. App. at Knoxville, Sept. 21, 2006). Petitioner failed to present an expert to testify about what fingerprints were present on the magazine or unfired bullet. Indeed, it is not at all clear there even were any fingerprints to be found. Petitioner has thus failed to demonstrate prejudice.

*Morris v. State*, 2010 WL 3970371 at *21.

Morris did not present any testimony or evidence in state court to support his allegations that fingerprint evidence would have been useful in his defense. It was undisputed that Morris was wearing gloves the morning of the shooting. It was also undisputed that James Davis handled and held the gun when he wrestled it away from Morris. (Trial Tr., Addendum 1, Volume 4, ECF No. 11-4 at Page ID # 606.)

Officer Bishop testified that his partner, Officer Gaylor, picked up the weapon and handed it to Bishop, who "checked it, cleared it. There was one live round in the chamber and no additional rounds in the magazine." (Trial Tr., Addendum 1, Volume 3, ECF No. 11-3 at Page ID # 461-63.) The gun was then "secured in [his] squad car." (Trial Tr., Addendum 1, Volume 3, ECF No. 11-3 at Page ID # 463.) Crime Scene Sergeant Oliver testified at trial that the gun "wasn't processed for fingerprints" because "the officer had handled the gun . . . possibly contaminated the gun." (Trial Tr., Addendum 1, Volume 3, ECF No. 11-3 at Page ID # 422.)

Sergeant Oliver also testified that fingerprints are not found often on guns. (Trial Tr., Addendum 1, Volume 3, ECF No. 11-3 at Page ID # 423.) Crime Scene Officer Peppers testified that the weapon was not processed for fingerprints because "[t]he weapon was collected by one of the scene officers before we arrived on the scene" and "we had determined that since the officers had handled the weapon it was contaminated." (Trial Tr., Addendum 1, Volume 3, ECF No. 11-3 at Page ID # 431-32.)

The Sixth Circuit "has held that a petitioner cannot show deficient performance or prejudice resulting from a failure to investigate if the petitioner does not make some showing of what evidence counsel should have pursued and how such evidence would have been material." *Hutchison v. Bell*, 303 F.3d 720, 748-749 (6th Cir. 2002). Because Morris offered no proof about the presence of fingerprints or how that proof would have benefitted the defense, Morris has failed to show prejudice for this alleged error on the part of his trial attorney. *Martin v. Mitchell*, 280 F.3d 594, 608 (6th Cir. 2002) (finding no prejudice where petitioner failed to demonstrate "how the retention of experts, an examination of Henderson's statement, and contacting and/or interviewing his family members would have been beneficial to his defense").

Absent a showing of prejudice, the state court correctly found that this claim of ineffective assistance lacks merit. Issue 1(f) is DENIED.

<u>Issue 2</u>

<u>Petitioner's Sentences Violate his Sixth Amendment Right</u>
<u>to Trial by Jury under Blakely v. Washington, 542 U.S.</u>
<u>296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004)</u>

Petitioner contends that his sentences violate the rule announced in *Blakely v. Washington*. (Am. Pet., ECF No. 3 at Page ID # 32.) The State responds that, to the extent this Court could find that the two enhancement factors relied on by the Court of Criminal Appeals on direct appeal violate *Blakely*, Morris is not entitled to habeas corpus relief because any *Blakely* error is harmless. (Answer, ECF No. 10 at Page ID 117-119.)

The Tennessee Court of Criminal Appeals concluded that, based on state law, several enhancement factors applied by the trial court were not supported by the record and reduced Petitioner's effective sentence. The Court of Criminal Appeals explained:

II. Excessive Sentence

After a sentencing hearing, the trial court sentenced the Defendant as a Range I, standard offender to a term of twenty-five years imprisonment for each conviction, to be served consecutively for an effective term of fifty years. In doing so, the trial court applied four enhancement factors to each conviction: that each offense involved more than one victim; that Morris employed a firearm during the commission of each offense; that Morris had no hesitation about committing each offense when the risk to human life was high; and each offense was committed under circumstances under which the potential for bodily injury to a victim was great. *See* Tenn. Code Ann. §§ 40-35-114(4), (10), (11), (17). . . . Morris now complains that the trial court erred in its application of enhancement factors, relying on *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004). . . .

A. Standard of Review

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; and (f) any statement the defendant wishes to make in the defendant's own behalf about sentencing. *See* Tenn. Code Ann. § 40-35-210(b); *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002). To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. *See State v. Samuels*, 44 S.W.3d 489, 492 (Tenn. 2001).

Upon a challenge to the sentence imposed, this court has a duty to conduct a *de novo* review of the sentence with a presumption that the determinations made by the trial court are correct. *See* Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then the presumption is applicable, and we may not modify the sentence even if we would have preferred a different result. *See State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). We will uphold the sentence imposed by the trial court if (1) the sentence complies with the purposes and principles of the 1989 Sentencing Act, and (2) the trial court's findings are adequately supported by the record. *See State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001). The burden of showing that a sentence is improper is upon the appealing party. *See* Tenn. Code Ann. § 40-35-401 Sentencing Commission Comments; *Arnett*, 49 S.W.3d at 257.

B. Application of Enhancement Factors

We turn first to the Defendant's contentions regarding the *Blakely* decision. In that case, the United States Supreme Court examined certain provisions of the State of Washington's sentencing scheme. Those provisions allowed a trial court to impose an "exceptional [that is, longer] sentence" after making a post-trial determination that certain statutory enhancement factors existed. This determination was to be made by the trial court without the benefit of a jury. The Supreme Court determined in *Blakely* that the protections in the Sixth Amendment to the United States Constitution would allow a defendant's sentence to be increased only if the enhancement factors relied upon by the trial court (other than prior criminal history) were based on facts reflected in the jury verdict or admitted by the defendant. *See* 124 S. Ct. at 2537. The Court concluded that "every defendant has the right to insist that the prosecutor prove to a jury all facts legally essential to the punishment." *Id.* at 2543. On the basis of this case, Morris argues that the trial court erred by enhancing his sentence based on facts not reflected in the jury verdict or admitted by him.

The Tennessee Supreme Court has considered the applicability of the *Blakely* decision to Tennessee's sentencing scheme in *State v. Gomez*, 163 S.W.3d 632 (Tenn. 2005). In *Gomez,* our high court concluded that Tennessee's sentencing structure does not violate a criminal defendant's Sixth Amendment right to a jury trial. *See id.* at 661. Accordingly, Morris' argument on this issue is misplaced. Morris is not entitled to relief on this basis.

We find pursuant to our *de novo* review, however, that the trial court erroneously applied certain enhancement factors in a manner contrary to law. Our Criminal Sentencing Reform Act of 1989 provides for the application of certain enhancement factors to a defendant's presumptive sentence if they are "appropriate for the offense" and "not themselves essential elements of the offense as charged in the indictment." Tenn. Code Ann. § 40-35-114. Moreover, our supreme court has recognized that "factors which are inherent in a particular offense, even if not designated as an element, should not be given substantive weight in increasing a sentence." *State v. Pike*, 978 S.W.2d 904, app. 927

(Tenn. 1998). Nevertheless, the trial court in this case applied two enhancement factors that are inherent in the crime of attempted premeditated murder: that the Defendant had no hesitation about committing a crime when the risk to human life was high, and that he committed the crimes under circumstances under which the potential for bodily injury to a victim was great. *See* Tenn. Code Ann. §§ 40-35-114(11), (17). This Court has previously held that these enhancement factors cannot be applied to a conviction for attempted first degree murder "because the risk to human life and the great potential for bodily injury always exist with an attempted first degree murder." *State v. Nix*, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995). *See also Pike*, (holding it inappropriate to apply the "no hesitation" factor to a conviction of conspiracy to commit first degree murder). Accordingly, the trial court erred when it enhanced Morris' sentences on the basis of these two factors.

The trial court also erred when it enhanced Morris' sentences for each crime on the basis that each offense involved more than one victim. *See* Tenn. Code Ann. § 40-35-114(4). This Court has held that this factor may not be applied when the defendant is separately convicted of the offenses involved against each victim. *See State v. Freeman*, 943 S.W.2d 25, 31 (Tenn. Crim. App. 1996). Here, there were only two victims and Morris was separately convicted of an offense as to each victim. Moreover, our supreme court has held that there cannot be multiple victims for any single offense where the indictment specifies a named victim. *See Imfeld*, 70 S.W.3d at 706. Morris was charged in a two count indictment in which Count 1 specified that Morris had attempted to commit first degree premeditated murder against Teresa Washington, and Count 2 specified that Morris had attempted to commit first degree premeditated murder against James Davis. Accordingly, the trial court should not have enhanced either of Morris' sentences on the basis that the offenses involved more than one victim.

The trial court properly enhanced each of Morris' sentences on the basis that Morris used a firearm during the commission of the crimes. *See* Tenn. Code Ann. § 40-35-114(10); *State v. Jackson*, 946 S.W.2d 329, 334 (Tenn. Crim. App. 1996). Moreover, we find that Morris' sentence for his attempted murder of James Davis should be enhanced on the basis that Morris' actions during the

commission of the felony resulted in serious bodily injury to James Davis. *See* Tenn. Code Ann. § 40-35-114(13). Mr. Davis testified that Morris shot him in the right chest. He also testified that the bullet remained in his body because "it would do more damage taking it out . . . because they'll have to split [his] chest open to get it." Ms. Washington also testified at the sentencing hearing that Mr. Davis was in the hospital as a result of this wound for "a few" weeks. We have no difficulty concluding that Mr. Davis' gunshot wound satisfies the definition of "serious bodily injury." *See id.* § 39-11-106(34). Moreover, this Court has previously held that this enhancement factor applies to a sentence for attempted murder where the victim is actually injured during the commission of the crime. *See Freeman*, 943 S.W.2d at 32. Accordingly, the trial court should have applied this enhancement factor to Morris' sentence for the attempted murder of Mr. Davis.

Morris was convicted of two Class A felonies. *See* Tenn. Code Ann. § 39-11-117(a)(2). The presumptive sentence for a Class A felony is the midpoint of the applicable range. *See id.* § 40-35-210(c). Morris was sentenced as a Range I, standard offender. The Range I sentence for a Class A felony is fifteen to twenty-five years. *See id.* § 40-35-112(a)(1). Accordingly, the presumptive sentence for each of Morris' convictions is twenty years.

Morris' sentence for his attempted murder of Teresa Washington was properly enhanced by one enhancement factor: that Morris used a firearm in the commission of the offense. *See id.* § 40-35-114(10). An increase of two years in Morris' presumptive sentence of twenty years is appropriate for the application of this single enhancement factor. Because the trial court erroneously applied three additional enhancement factors to arrive at a sentence of twenty-five years, we modify Morris' sentence for his attempted murder of Teresa Washington to twenty-two years.

Morris' sentence for his attempted murder of James Davis is properly enhanced by two enhancement factors: that Morris used a firearm in the commission of the offense, and that Morris' actions during the commission of the offense caused James Davis to suffer serious bodily injury. *See id.* §§ 40-35-114(10), (13). An increase of five years to Morris' presumptive sentence of

twenty years is appropriate for the application of these
two enhancement factors. Accordingly, we affirm the
trial court's imposition of a twenty-five year sentence
for Morris' attempted murder of James Davis.

*State v. Morris*, 2005 WL 6235723 at *8-*11.

Morris' conviction was not final when the decision in *Blakely*
was announced.[12] After Morris' conviction became final, the
Tennessee Supreme Court acknowledged that Tennessee's Criminal
Sentencing Act Reform Act of 1989, *see* Tenn. Code Ann. § 40-35-210
(2000), was unconstitutional under *Blakely*. *State v. Gomez*, 239
S.W.3d 733, 740 (Tenn. 2007) ("*Gomez II*"). The Sixth Circuit has
summarized the relevance of *Blakely*, to Tennessee's sentencing law
as follows:

> At this point, a short primer on *Blakely* is
> necessary to understand the parties' arguments. The
> relevant United States Supreme Court precedent begins
> with *Apprendi v. New Jersey*, which held that "[o]ther
> than the fact of a prior conviction, any fact that
> increases the penalty for a crime beyond the prescribed
> statutory maximum must be submitted to a jury, and proved
> beyond a reasonable doubt." 530 U.S. 466, 490, 120 S.
> Ct. 2348, 147 L. Ed. 2d 435 (2000). Four years later, in

---

[12] State convictions ordinarily become "final" within the meaning of §
2244(d)(1)(A) when the time expires for filing a petition for a writ of
certiorari from a decision of the highest state court on direct appeal. *Pinchon
v. Myers*, 615 F.3d 631, 640 (6th Cir. 2010); *Sherwood v. Prelesnik*, 579 F.3d 581,
585 (6th Cir. 2009). The Tennessee Court of Criminal Appeals issued its decision
on direct appeal on September 7, 2005. Petitioner did not seek permission to
appeal. Rule 11(b) of the Tennessee Rules of Appellate Procedure provides that
"[t]he application for permission to appeal shall be filed with the clerk of the
Supreme Court within 60 days after the entry of the judgment of the Court of
Appeals or Court of Criminal Appeals if no timely petition for rehearing is
filed, or, if a timely petition for rehearing is filed, within 60 days after the
denial of the petition or entry of the judgment on rehearing." The sixtieth day
fell on Sunday, November 6, 2005. Petitioner had until the close of business on
the next business day, November 7, 2005, to seek permission to appeal. Tenn.
Rule App. P. 21(a). Because Petitioner did not seek permission to appeal to the
Tennessee Supreme Court, he was not entitled to file a petition for a writ of
certiorari with the United States Supreme Court.

*Blakely*, the Court clarified that the definition of "'statutory maximum' for *Apprendi* purposes is not the high-end that a sentence may not exceed, but rather the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely*, 542 U.S. at 303, 124 S. Ct. 2531. A year later, the Court clarified that the *Apprendi/Blakely* rule applies to the federal sentencing guidelines. *United States v. Booker*, 543 U.S. 220, 226-27, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005).

> In its first encounter with *Blakely*, the Tennessee Supreme Court determined that the rule did not necessarily invalidate § 40-35- 210. *State v. Gomez*, 163 S.W.3d 632, 661 (Tenn. 2005) ("*Gomez I*"). The defendants in *Gomez I*, however, filed a petition for certiorari to the United States Supreme Court. On January 27, 2007, the Court invalidated California's sentencing procedure, which was virtually identical to Tennessee's. *Cunningham v. California*, 549 U.S. 270, 127 S. Ct. 856, 166 L. Ed. 2d 856 (2007). On February 20, 2007, the Supreme Court vacated *Gomez I* and remanded the case to the Tennessee Supreme Court for consideration in light of *Cunningham*. *Gomez v. Tennessee*, 549 U.S. 1190, 127 S. Ct. 1209, 167 L. Ed. 2d 36 (2007). On remand, the Tennessee Supreme Court acknowledged that § 40-35-210 "violated the Sixth Amendment as interpreted by the Supreme Court in *Apprendi*, and *Cunningham*." *State v. Gomez*, 239 S.W.3d 733, 740 (Tenn. 2007) ("*Gomez II*").

*Lovins v. Parker*, 712 F.3d 283, 289-09 (6th Cir. 2013).

As the law stands today, Morris' sentence violated the Sixth Amendment. Respondent urges the Court to deny the habeas writ because the record contains overwhelming and uncontroverted evidence that would support a jury finding on the two remaining applicable enhancements, thus rendering the *Blakely* error harmless. (Answer, ECF No. 10 at Page ID # 117-18.)

A *Blakely* error is not "structural" and is thus amenable to a harmless-error analysis. *Villagarcia v. Warden*, 599 F.3d 529, 536

(6th Cir. 2010) (citing *Washington v. Recuenco*, 548 U.S. 212, 218, 221, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006)). "Under the harmless error test, a remand for an error at sentencing is required unless we are certain that any such error was harmless - i.e. any such error 'did not affect the district court's selection of the sentence imposed.'" *United States v. Hazelwood*, 398 F.3d 792, 801 (6th Cir. 2005) (citing *Williams v. United States*, 503 U.S. 193, 203, 112 S. Ct. 1112, 117 L. Ed. 2d 341 (1992)).

The more state-friendly standard from *Brecht v. Abrahamson*, 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993), is applied in the context of AEDPA. Under the *Brecht* standard, "an error is harmless unless it had substantial and injurious effect or influence" on the outcome of the case. *Fry v. Pliler*, 551 U.S. 112, 116, 127 S. Ct. 2321, 168 L. Ed. 2d 16 (2007) (internal quotation marks omitted). "Under *Fry*, an error is considered not harmless when 'the matter is so evenly balanced that the habeas court has grave doubt as to the harmlessness of the error.'" *Villagarcia*, 599 F.3d at 537 (quoting *Hereford v. Warren*, 536 F.3d 523, 533 (6th Cir.2008)).

The *Recuenco* Court observed that

Our decision in *Apprendi* [*v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000),] makes clear that "[a]ny possible distinction between an 'element' of a felony offense and a 'sentencing factor' was unknown to the practice of criminal indictment, trial by jury, and judgment by court as it existed during the years surrounding our Nation's founding." [*Id.*] at 478 [120 S. Ct. 2348] (footnote omitted). Accordingly, we have

66

> treated sentencing factors, like elements, as facts that
> have to be tried to the jury and proved beyond a
> reasonable doubt. [*Id.* at 483–84, 120 S. Ct. 2348.]

548 U.S. at 220, 126 S. Ct. 2546 (second alteration in original).

A *Blakely* error is treated the same way as an error in instructing

the jury on the essential elements of a crime. *Ibid*. (citing *Neder

v. United States*, 527 U.S. 1, 119 S. Ct. 1827, 144 L. Ed. 2d 35

(1999)); *see also United States v. Williams*, 493 F.3d 763, 766 (7th

Cir. 2007) ("The implication of equating sentencing factors and

elements of a crime for purposes of the requirements of the jury and

the burden of proof is to equate them also for harmless error

purposes."). A jury-instruction error is harmless if it "is clear

beyond a reasonable doubt that a rational jury would have found the

defendant guilty absent the error." *United States v. King*, 272 F.3d

366, 378 (6th Cir. 2001) (citing *Neder*, 527 U.S. at 18, 119 S. Ct.

1827).

No doubt exists in this case. The record is replete with

uncontroverted evidence supporting the two enhancements upheld by

the Tennessee Court of Criminal Appeals on direct appeal. The Court

of Criminal Appeals found that Morris "possessed or employed a

firearm . . . during the commission of the offense[s]." Tenn. Code

Ann. § 40-35-114(10) (2002) (current version at Tenn. Code Ann. §

40-35-114(9) (2012)). The appellate court also held that Morris'

sentence for the attempted murder of James Davis should be enhanced

on the basis that Morris' actions during the commission of the

felony resulted in serious bodily injury to James Davis. *See* Tenn. Code Ann. § 40-35-114(13) (2002) (current version at Tenn. Code Ann. § 40-35-114(12) (2012)).

Teresa Washington testified that she opened the door and "heard the gun go off, boom, and [ ] seen the flash . . . it went off again and [she] felt the second bullet go past [her] temple and [she] dropped to [the] floor to play dead." (Tr. of Trial, Addendum I, Volume 4, ECF No. 11-4, Page ID # 518.) Washington testified that she felt "the wind of the bullet go past." (Tr. of Trial, Addendum I, Volume 4, ECF No. 11-4, Page ID # 518.) Ms. Washington stated that the Petitioner stepped over her and "James was behind me . . . [she] heard a shot go off. [She] heard boom, boom, boom go off. . . [she] don't want to die . . . And Mr. Davis - [she] heard a boom, and they went down to the floor." (Tr. of Trial, Addendum I, Volume 4, ECF No. 11-4, Page ID # 519.) Later Washington testified "that's when [she] heard Roosevelt's voice. He was like, man, y'all ruined my life. I'm going to kill y'all." (Tr. of Trial, Addendum I, Volume 4, ECF No. 11-4, Page ID # 521.) Washington testified that Petitioner Morris brought the gun into her house. (Tr. of Trial, Addendum I, Volume 4, ECF No. 11-4, Page ID # 523.) Washington ran to get help and when she saw police lights she "ran back across the street. And she s[aw] Mr. Davis laying on the porch bleeding." (Tr. of Trial, Addendum I, Volume 4, ECF No. 11-4, Page ID # 528.)

James Davis testified that "Ms. Washington opened the inner door and she unlocked the outer door and all of a sudden a body appear. [He heard] a shot, boom, she screams, she falls. And, well, after that this gentleman entered the house, he shoots [me] and he[] just goes shooting three or four more times."  (Tr. of Trial, Addendum I, Volume 4, ECF No. 11-4, Page ID # 601.)  Davis testified that he thought Petitioner had killed Ms. Washington.  (Tr. of Trial, Addendum I, Volume 4, ECF No. 11-4, Page ID # 605.)  Davis testified that Petitioner shot him in the right side of the chest. (Tr. of Trial, Addendum I, Volume 4, ECF No. 11-4, Page ID # 605.) Davis testified that when he realized Petitioner's gun had jammed, he threw Petitioner to the floor and Petitioner's head hit the coffee table.  (Tr. of Trial, Addendum I, Volume 4, ECF No. 11-4, Page ID # 607-08.)  Davis testified he was taken by paramedics to the Regional Medical Center, but the bullet is still inside him. (Tr. of Trial, Addendum I, Volume 4, ECF No. 11-4, Page ID # 614-15.)  He testified that "they said it would do more damage taking it out than they would leaving it in because they'll have to split my chest open to get it."  (Tr. of Trial, Addendum I, Volume 5, ECF No. 11-5, Page ID # 623.)  Davis was hospitalized for three weeks. (Tr. of Trial, Addendum I, Volume 5, ECF No. 11-5, Page ID # 623.)

The jury accredited the testimonies of Washington and Davis. This evidence leaves little doubt, let alone grave doubt, that the jury would have found that Morris possessed and used a gun during

the attempted first degree premeditated murders of Davis and Washington beyond a reasonable doubt. The record is teeming with relevant and persuasive evidence that Morris possessed and used a firearm during the commission of the offenses and that his actions caused serious bodily injury to James Davis. There is no doubt that the failure to submit these elements to the jury was harmless in based on the record before the Court.

Based on the record, the state court undoubtably would have imposed the same sentence absent the *Blakely* error, and it was therefore harmless. Because the Court is free of grave doubt that a jury would have found the omitted element or enhancement satisfied beyond a reasonable doubt, Morris is entitled to no relief. As the Supreme Court stated in *Neder*, the case that formed the logical basis for *Recuenco*: "[T]his approach reaches an appropriate balance between society's interest in punishing the guilty and the method by which decisions of guilt are to be made." 527 U.S. at 18, 119 S. Ct. 1827. Because he has failed to show harm resulting from the state's error, Morris is not entitled to habeas relief. Issue 2 is DENIED.

Because the issues raised by Morris are barred by procedural default or without merit, the Petition is DISMISSED WITH PREJUDICE. Judgment shall be entered for Respondent.

V.   APPEAL ISSUES

There is no absolute entitlement to appeal a district court's denial of a § 2254 petition. *Miller-El v. Cockrell*, 537 U.S. 322, 335, 123 S. Ct. 1029, 1039, 154 L. Ed. 2d 931 (2003); *Bradley v. Birkett*, 156 F. App'x 771, 772 (6th Cir. 2005). The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. Rule 11, Rules Governing Section 2254 Cases in the United States District Courts. A petitioner may not take an appeal unless a circuit or district judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).

A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue or issues that satisfy the required showing. 28 U.S.C. §§ 2253(c)(2) & (3). A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336, 123 S. Ct. at 1039 (citing *Slack v. McDaniel*, 529 U.S. 473, 84, 120 S. Ct. 1595, 1603-04, 146 L. Ed. 2d 542 (2000)); *Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (same), *cert. denied*, 555 U.S. 1160, 129 S. Ct. 1057, 173 L. Ed. 2d 482 (2009). A COA does not require a

showing that the appeal will succeed. *Miller-El*, 537 U.S. at 337, 123 S. Ct. at 1039; *Caldwell v. Lewis*, 414 F. App'x 809, 814-15 (6th Cir. 2011) (same). Courts should not issue a COA as a matter of course. *Bradley*, 156 F. App'x at 773 (quoting *Slack*, 537 U.S. at 337, 123 S. Ct. at 1039).

In this case, there can be no question that the claims in this petition are barred by procedural default or without merit. Because any appeal by Petitioner on the issues raised in this petition does not deserve attention, the Court DENIES a certificate of appealability.

In this case, for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to Fed. R. App. P. 24(a), that any appeal in this matter would not be taken in good faith, and leave to appeal *in forma pauperis* is DENIED.[13]

IT IS SO ORDERED this 30th day of June, 2014.

**s/ S. Thomas Anderson**

S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

---

[13] If Petitioner files a notice of appeal, he must pay the full $505 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within thirty (30) days of the date of entry of this order. *See* Fed. R. App. P. 24(a)(5).